JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
April Roberts

**DEFENDANTS**
Spruce Manor Nursing & Rehabilitation Center; Northern Facilities, Inc. Extendicare Health Services, Inc.; Jason Auge; and Betsy Robles

**(b)** County of Residence of First Listed Plaintiff   Lancaster
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Berks
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephen S. Werner, PA ID 316303
Werner Law Group, P.O. Box 4886, Harrisburg, PA  17111
(717) 253-9900

Attorneys *(If Known)*
Vincent Candiello, PA ID 49616; Sarah C. Yerger, PA ID 70357
Post & Schell, P.C., 17 North Second Street, 12th Floor
Harrisburg, PA  17101, (717) 731-1970

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. § 185
Brief description of cause:
Defamation claim subject to Section 301 preemption

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  7/17/14

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| APRIL ROBERTS, | : | CIVIL ACTION |
| v. | : | |
| SPRUCE MANOR NURSING & | : | NO. |
| REHABILITATION CENTER, ET AL., | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)　　( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　(X)

| | | |
|---|---|---|
| 7/16/14 | _(signature)_ | Defendants |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (717) 731-1970 | (717) 731-1985 | syerger@postschell.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 20 Village Spring Lane, Reinholds, PA 17569

Address of Defendant: 220 South 4th Avenue, West Reading, PA 19611

Place of Accident, Incident or Transaction: 220 South 4th Avenue, West Reading, PA 19611

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☒

Does this case involve multidistrict litigation possibilities?   Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☒ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Sarah C. Yerger_____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 7/16/14_____   _____   70357_____

Attorney-at-Law   Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 7/16/14_____   _____   70357_____

Attorney-at-Law   Attorney I.D.#

CIV. 609 (5/2012)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

APRIL ROBERTS,
            Plaintiff,

           v.

SPRUCE MANOR NURSING &
REHABILITATION CENTER,
NORTHERN  HEALTH FACILITIES, INC.,
EXTENDICARE HEALTH SERVICES,
INC., JASON AUGE, and BETSY ROBLES,
            Defendants.

NO.

Jury Trial Demanded

---

## REMOVAL PETITION

Defendants, by and through their undersigned counsel, hereby remove the above-captioned action from the Court of Common Pleas of Berks County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania. Defendants state the following grounds to support removal:

1.    On June 24, 2014, plaintiff filed a Complaint in the Court of Common Pleas of Berks County, Pennsylvania, at Docket No. 2014-CV-14863. A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

2.    Those suit papers were served upon all defendants on or about June 27, 2014.

3.    The Complaint names Spruce Manor Nursing and Rehabilitation Center, Northern Health Facilities, Inc. and Extendicare Health Services, Inc. as the corporate-entity defendants which employed Plaintiff. (Complaint, ¶¶ 2, 3, 4, 9).

4.    The Complaint also names individual Defendants, Jason Auge and Betsy (sic) Robles[1], as agents, apparent agents, and employees of Spruce Manor, Northern, and Extendicare.

---

[1] Ms. Nobles first name is Quetsy, not Betsy.

(Complaint, ¶¶ 5, 6).  The Complaint avers that Robles and Auge were acting within the scope of their respective employments with Spruce Manor, Northern, and Extendicare. (Complaint, ¶¶ 37, 91).

5.      The instant dispute arises out of a Confidential Settlement Agreement (SA) between Plaintiff; Plaintiff's union, Service Employees International Union (SEIU); and the Defendants which was entered into to resolve a grievance filed by Plaintiff protesting her employment termination.   (See Complaint ¶¶ 23, 28, 29, 30, 31, 50, 79).

6.      In her Complaint, Plaintiff alleges that Defendants "breached" the Settlement Agreement; that they were "under contract not to disclose any information"" and that they violated the Confidential Settlement Agreement, which required a neutral reference, when Defendants responded to a service letter and declared that she was discharged.  (Complaint, ¶¶ 29, 30, 31, 39, 40, 50, 79).  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit B**, and was attached to the Complaint as Exhibit A.

7.      Specifically, Plaintiff declares that, "Defendants were under contract not to disclose any information to a prospective employer other than giving a neutral reference." (Complaint, ¶79, SA at ¶1a).

8.      Defendants received the service letter which required by law a truthful response. Also attached to the service letter was a release form which Plaintiff had signed allowing Defendants to respond truthfully to the service letter.  A true and correct copy of the Service letter/Release form is attached hereto as **Exhibit C**, and was attached to the Complaint as Exhibit B.

9.      The defamation claim in the Complaint, therefore, arises out of an alleged breach of the negotiated Confidential Settlement Agreement which represented the resolution of the

- 2 -

grievance filed pursuant to the collective bargaining agreement (CBA) between Plaintiff, Plaintiff's Union, and the Defendants. The CBA applicable to Plaintiff's Union and Defendants provides for a mandatory grievance/arbitration dispute-resolution process.  (CBA, p. 40).  A true and correct copy of the relevant CBA is attached hereto as **Exhibit D.**

10.     Pursuant to the CBA, the arbitration procedure is the sole method to be used to resolve all disputes between the parties.  (CBA, p. 41).

11.     Because Plaintiff's claim of defamation arises out of an alleged breach of the Confidential Settlement Agreement, (**Exhibit B** attached hereto) entered into between Plaintiff, her Union, and Defendants, the grievance/arbitration process is the sole manner of dispute resolution available to her.

12.     For claims and disputes arising out of a contract between an employer and a union acting on behalf of a member employee, Section 301 of the LMRA applies, and Plaintiff's defamation claim is preempted by Section 301 of the LMRA.  29 U.S.C. § 185; *Beidleman v. Stroh Brewery Co.*, 182 F.3d 225 (3d Cir. 1999).

13.     "[I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute." *Denao v. SEIU, Local 32BJ,* 2014 U.S. Dist. LEXIS 79365 (E.D. Pa. June 10, 2014); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988).  State-law tort and contract claims that are "inextricably intertwined with" or "substantially dependent upon analysis of the terms of . . . a labor contract . . . must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 220, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985).

14.     Pursuant to Plaintiff's allegations in her Complaint, the elements alleged as defamation require that resolution substantially depends on interpreting the Confidential Settlement Agreement, which was negotiated between Plaintiff's Union and Defendants. Plaintiff claims a "breach" of the Settlement Agreement, and that Defendants were "**under contract** not to disclose any information" and that Defendants violated the contract by not giving a neutral reference, when Defendants responded to a service letter that stated that she was discharged. (Complaint, ¶¶ 29, 30, 31, 39, 40, 50, 79; emphasis added).

15.     Consequently, Plaintiff's defamation claim is "inextricably intertwined with" and "substantially dependent upon" the Confidential Settlement Agreement which is a labor agreement in its own right and which arose out of the CBA.  The resolution of the defamation action depends on interpretation of the Confidential Settlement Agreement and the CBA.

16.     A settlement agreement on behalf of individual employee is a labor contract for purposes of § 301 when a union is involved in negotiating the agreement on behalf of an employee and the agreement is intended to peacefully resolve an issue arising from the employment relationship.  *Nicholas v. Grapetree Shores, Inc.*, 2011 U.S. Dist. LEXIS 67494, 2011 WL 2518804 (D.V.I. June 22, 2011); *Karnes v. Boeing Co.*, 335 F.3d 1189, 1197-98 (10th Cir. 2003).

17.     The Union was a party to the Confidential Settlement Agreement and signed it on behalf of itself. (See **Exhibit B**, p. 3).

18.     Under Section 301 of the Labor Management Relations Act (LMRA), suits for violation of contracts between an employer and a labor organization may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. (29 U.S.C. § 185 (1998)).

- 4 -

19.     Pursuant to 29 U.S.C. § 185, this Court has jurisdiction over Section 301 claims, and the action is removable to this court pursuant to 28 U.S.C. § 1441.

20.     This Removal Petition is timely filed pursuant to 28 U.S.C. § 1446(b) as it is filed within 30 days of the Defendants' receipt of the Complaint.

21.     Pursuant to 28 U.S.C. § 1446(a), venue is proper in the United States District Court for the Eastern District of Pennsylvania because this matter was pending in Berks County, Pennsylvania which is located within this judicial district.

22.     All named Defendants in this civil action consent to removal of this action from the Commonwealth of Pennsylvania, Court of Common Pleas of Berks County to the United States District Court for the Eastern District of Pennsylvania.

23.     Thus, under the authority of 29 U.S.C. § 185, this action may properly be removed to this Court because it has jurisdiction over Plaintiff's claims.

24.     Defendants have attached copies of all process served in this case to date.

25.     Pursuant to 28 U.S.C. § 1446(d), Defendants are on this date serving a Notice of Removal with the Prothonotary of the Court of Common Pleas of Berks County for filing and serving a copy of the same on Plaintiff.  A true and correct copy of the Notice is attached hereto as **Exhibit E.**

26.     Defendants specifically reserve, and by the filing of this Removal Petition do not waive, applicable defenses to plaintiff's Complaint.  The filing of this Removal Petition does not represent acknowledgement of the validity of any claims made by plaintiff.

- 5 -

**WHEREFORE**, the Defendants respectfully remove this action to the United States District Court for the Eastern District of Pennsylvania.

Respectfully submitted,

SARAH C. YERGER, ESQUIRE
Attorney I.D. #70357
VINCENT CANDIELLO, ESQUIRE
Attorney I.D. # 49616
17 NORTH SECOND STREET
12TH FLOOR
HARRISBURG, PA 17101-1601
Phone: 717-731-1970
Fax: 717-731-1985
Email:  syerger@postschell.com
          vcandiello@postschell.com

Dated:  July 17, 2014                            Attorneys for Defendants

12099945v1

## CERTIFICATE OF SERVICE

I, Sarah C. Yerger, Esquire, an attorney at the law firm of Post & Schell, P.C., do hereby certify that on the date set forth below, I did cause to be served a true and correct copy of the foregoing document upon the following individual(s) via U.S. Mail, First Class, postage prepaid, as follows:

Stephen S. Werner, Esquire
Werner Law Group
P.O. Box 4886
Harrisburg, PA  17111

Dated:  July 17, 2014

Sarah C. Yerger

12099945v1

# EXHIBIT "A"

WERNER LAW GROUP
P.O. Box 4886
Harrisburg, PA 17111
Tel. (717) 253-9900
Stephen@WernerLawPa.com
Attorney for Plaintiff

| | |
|---|---|
| APRIL L. ROBERTS | : IN THE COURT OF COMMON PLEAS |
| | : BERKS COUNTY, PENNSYLVANIA |
| Plaintiff | : |
| | : |
| v. | : No. 2014-CV-14865 |
| | : |
| SPRUCE MANOR NURSING & | : |
| REHABILITATION CENTER; | : CIVIL ACTION -- LAW |
| NORTHERN HEALTH FACILITIES, | : |
| INC; EXTENDICARE HEALTH | : TORTS -- DEFAMATION |
| SERVICES, INC; JASON AUGE; | : |
| BETSY ROBLES | : JURY TRIAL DEMANDED |
| | : |
| Defendants | : |

## COMPLAINT

NOW comes Plaintiff, APRIL L. ROBERTS, and hereby files, through her counsel, Stephen S. Werner, Esquire, a Complaint and avers as follows:

## THE PARTIES

1.  Plaintiff, April L. Roberts, is an adult individual and nursing professional

    licensed in Pennsylvania and Delaware, who at the times of the events alleged

herein, resided at 20 Village Spring Lane, Reinholds, Pennsylvania 17569, and at 20 Korda Drive, Newark, Delaware 19713.

2. At all relevant times herein, Defendant SPRUCE MANOR AND REHABILITATION CENTER ("Spruce Manor"), was a registered Pennsylvania fictitious entity situated and operating at 220 South 4th Avenue (4th Ave. & Spruce St.), West Reading, Berks County, Pennsylvania, 19611, engaged in the business of long- and short-term skilled nursing care and rehabilitation services for residents and patients.

3. At all relevant times herein, Defendant NORTHERN HEALTH FACILITIES, INC. ("Northern"), the listed Owner of Spruce Manor, was a registered Foreign Business Corporation registered and incorporated in the Commonwealth of Pennsylvania (Entity Number 754147) engaging in a business or profession at 220 S. 4th Avenue, West Reading, Berks County, Pennsylvania, 19611.

4. At all relevant times herein, Defendant EXTENDICARE HEALTH SERVICES, INC. ("Extendicare") was a Foreign Business Corporation registered and incorporated in the Commonwealth of Pennsylvania (Entity Number 1087287), operating and doing business as (d/b/a) Spruce Manor, engaging in a business or profession at 220 S. 4th Avenue, West Reading, Berks County, Pennsylvania, 19611, and as other d/b/a names at locations throughout Pennsylvania, Delaware, and other states.

5. At all relevant times herein, Defendant JASON AUGE was an adult individual and the Administrator of Defendant Spruce Manor, and an agent, apparent agent, and employee of Defendants Spruce Manor, Northern, and Extendicare.

6.  At all relevant times herein, Defendant BETSY ROBLES was an adult individual and an employee involved with Human Resources and Payroll at Defendant Spruce Manor, and an agent, apparent agent, and employee of Defendants Spruce Manor, Northern, and Extendicare.

7.  Jurisdiction is proper in the Commonwealth of Pennsylvania with all Defendants situated, operating, engaged in a business or profession, resident, or domiciled in Pennsylvania.

8.  Venue is proper in Berks County with at least one Defendant situated, operating, engaged in a business or profession, resident, or domiciled in Berks County.

## FACTUAL ALLEGATIONS

9.  Plaintiff April Roberts ("Ms. Roberts") was employed as a nursing professional by Spruce Manor, Northern, and Extendicare from January 2007 through June 2011.

10. Ms. Roberts, at all relevant times herein, maintained her nursing license and credentials in good order with appropriate jurisdictions.

11. Ms. Roberts, at all relevant times herein, was under no disciplinary regime of either any of the licensing jurisdictions or any employer.

12. Ms. Roberts, as a nursing professional, performed the duties she was hired and assigned to perform, that of caring for residents and patients of Spruce Manor.

13. Ms. Roberts performed her nursing duties in a professional manner and was an otherwise exemplary employee.

3

14. One of Ms. Roberts's duties was to assist lab technicians in the drawing of blood in conjunction with resident and patient care, at the request and direction of doctors.

15. In June 2011, Ms. Roberts was assigned, along with another nurse, to assist a lab technician to perform a draw of blood from a particular resident in her patient room.

16. Following this event, Defendants accused Ms. Roberts of certain bad acts related to the performance of this duty.

17. Defendants accused Ms. Roberts of physically restraining and forcing the resident to receive the lab draw of blood against the resident's wishes.

18. Defendants interpreted and construed these alleged acts as a violation of a resident's right to not have blood drawn against her wishes.

19. Defendants subsequently, in the collection of information regarding the incident, caused a lab technician, Patricia White, to sign a written statement dated June 22, 2011, regarding the incident with the resident.

20. The written statement which the lab technician was caused to sign was prepared by someone else.

21. The statement indicated that nurses were holding the resident so blood could be drawn from the resident who was kicking and biting.

22. Defendants then attempted at that time to terminate Ms. Roberts's employment based upon those allegations.

23. Ms. Roberts protested the attempted termination of her employment by filing a grievance with SEIU Healthcare (the "Union").

24. Defendants were not able to substantiate the allegations against Ms. Roberts.

   a. A letter dated October 7, 2011, was written by Richard Groff of SEIU Healthcare, regarding his investigation stemming from the grievance, wherein he reported that "April Roberts did not engage in any willful misconduct that would have led to her termination".

   b. Richard Groff's report also indicated that "any injuries to the resident in question were not the result of abuse by Ms. Roberts".

   c. Richard Groff's letter indicated that Defendant Jason Auge "concurred that the evidence presented regarding the injury to the resident . . . could not be connected to Ms. Roberts (sic) actions".

   d. In October 2011, the findings of fact in an appeal proceeding for Unemployment Compensation also undermined Defendants' attempted termination of Ms. Roberts.

   e. The findings of fact determined that "[Ms. Roberts] did not forcefully restrain the resident during the blood draw".

   f. The findings of fact also indicated that "the sole witness who testified on behalf of employer did not witness the incident . . . ." and that "the employer failed to meet the burden of proof in this case."

25. It was apparent from investigations and reports that not only was the alleged abuse not substantiated, but the allegations and evidence had been false.

26. No other incidents occurred which could have been the basis for Ms. Roberts's attempted termination.

27.  Despite being entirely exonerated, Ms. Roberts was also wrongly accused by Defendants of being the cause of the resident's broken leg.

28.  Nevertheless, even though there were absolutely no such acts committed by Ms. Roberts, and no findings or evidence of such, she and Defendants elected to amicably part ways by arranging for Ms. Roberts to resign.

29.  In consideration of this amicable arrangement, the parties entered into a written Confidential Settlement Agreement.

30.  The Confidential Settlement Agreement ("Agreement") specified that Ms. Roberts would no longer be employed by Defendants and would release Defendants for any claims arising up to the point of the Agreement, and that Defendants, if contacted by prospective employers for a reference, would only provide a "neutral reference".

31.  This Agreement was in writing and signed by all parties in March 2012 (copy attached hereto – Exhibit A).

32.  With this assurance in mind, Ms. Roberts agreed to leave Defendant's employ without further protest, appeal, or action.

## THE DEFAMATORY ACTS

33.  In December 2013, Ms. Roberts became employed at another healthcare employer, Regal Heights Healthcare located at 6525 Lancaster Pike, Hockessin, Delaware.

34.  At that time, Regal Heights, as part of its hiring process, sent a request (the "service letter") to Defendants Spruce Manor and Extendicare inviting information about Ms. Roberts as a former employee of Defendants.

6

35. Defendants had no obligation to respond to Regal Heights concerning Ms. Roberts.

36. Defendants chose to send a response to Regal Heights.

37. Defendants' response, dated January 30, 2014, was sent to Regal Heights under signature of Defendant "Betsy Robles, HR/Payroll", acting on behalf of and within the scope of her employment with Defendants.

38. Defendant Betsy Robles had express, implied, or apparent authority of Spruce Manor and Extendicare.

39. Defendants' response indicated distinctly that Ms. Roberts's reason for separation was "Discharged".

40. Defendants' response indicated that as relates to her performance, she was "counselled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving abuse of patients/clients/residents/children."

41. The service letter additionally indicated in an Optional section whether "I would rehire this individual" which was checked "no" (copy attached -- Exhibit B).

42. This information, sent and published to Regal Heights Healthcare, an employer not in any way affiliated with Defendants, was not a neutral reference.

43. This information, sent and published to Regal Heights Healthcare, was extremely false, negative, and damaging.

44. None of the damaging information in the service letter could in any way be reasonably substantiated by Defendants.

7

45. It was well known to Defendants that Ms. Roberts had not committed any such or similar acts as alleged in the service letter sent to Regal Heights.

46. In February 2014, Regal Heights received this service letter from Defendants regarding Ms. Roberts and her employment with Defendants.

47. As soon as Regal Heights received this service letter from Defendants regarding Ms. Roberts, and based upon the false and damaging information in the service letter, to Ms. Roberts's shock and horror, on Monday, February 3, 2014, several managers of Regal Heights—believing this false information to be true that Ms. Roberts had "abused" a "patient, client, resident, or child"— immediately confronted and interrogated Ms. Roberts.

48. Ms. Roberts attempted to verbally explain to managers of Regal Heights that this information in the letter from Defendants was in error.

49. On February 3, 2014, based upon the information in the service letter received from Defendants, Regal Heights immediately terminated Ms. Roberts's employment with that facility.

50. Devastated and flabbergasted not only at being confronted, interrogated, and fired from her employment with Regal Heights, but also at this false and damaging communication from Defendants to Regal Heights, at breach of the Agreement, and at the potentially irreparable damage to her career and reputation, Ms. Roberts set about with all haste and diligence to contact Defendants to have Defendants rectify this so that she could save her career and reputation.

8

51. On February 4, 2014, the very next day after being fired by Regal Heights, Ms. Roberts contacted the Union by phone, in order to give Defendants the opportunity to mitigate their actions and repair any damage inflicted.

52. In her desperate plea to Defendants, Ms. Roberts enlisted the assistance of Union personnel in Pennsylvania, specifically Cathy Brady, Vice Chair of the Union, and Neil Bisno, President of the Union, who attempted to intercede with Defendants on Ms. Roberts's behalf.

## DELAY AND FAILURE TO ACT

53. Despite having the opportunity to immediately make a correction, Defendants chose to not immediately repair or to mitigate the damage to Ms. Roberts's career and reputation.

54. Defendant sent no immediate amended service letter.

55. Defendants took no immediate affirmative action to contact Regal Heights to correct the damaging error.

56. After a substantial delay, and continued pleading by Ms. Roberts, a cover letter and amended service letter was prepared, dated February 14, 2014, written on Spruce Manor stationery under signature of Defendant Jason Auge, NHA.

57. This amended service letter was addressed by Mr. Auge, not to Regal Heights, but—to Ms. Robert's shock—to her own home address.

58. Ms. Roberts received a copy of this first amended service not from Mr. Auge or Spruce Manor, but through Union personnel.

59. This first amended service letter did not clearly identify Ms. Roberts.

60. When Ms. Roberts received this letter, she immediately and frantically protested because it was addressed to her and not to Regal Heights.

61. Defendants then scrawled by hand, upon a copy of the exact same letter addressed to Ms. Roberts, still not addressed to Regal Heights but to Ms. Roberts's home address, the words, "CC: Regal Heights".

62. This second amended service letter still did not clearly identify Ms. Roberts.

63. Ms. Roberts contacted Regal Heights to see if they had received the corrected letter, but no one at Regal Heights was able to confirm receipt.

64. Again, Ms. Roberts frantically pleaded with Defendants

65. As a result of Ms. Roberts's pleading, on or about February 22, 2014, a short new cover letter addressed to Rhonda Quinlan at Regal Heights was drafted by Defendants which merely indicated in the attached service that Ms. Roberts had "resigned" with no other justifying or curative explanation.

66. This third amended service letter, although prepared on February 22, was dated February 14 to give the appearance it had been prepared on that date.

67. This letter still did not clearly identify Ms. Roberts as its subject.

68. None of the amended service letters made any attempt to repair the damage inflicted by the original defamatory service letter sent by Defendants.

69. Defendants never confirmed whether Regal Heights ever received any of the amended service letters.

70. Defendants never made telephone or other contact with Regal Heights in an effort to repair the damage inflicted by the original defamatory service letter.

71. Regal Heights did not rescind their firing of Ms. Roberts.

72. As a result of this subsequent delay by Defendants, damage to Ms. Roberts's reputation and career was beyond repair.

73. Defendants could clearly foresee, as an employer and employment professional, the potential for damage to the reputation and career of a nursing professional such as Ms. Roberts.

74. Defendants had the opportunity to act with urgency and swiftness, to take any and all affirmative and diligent measures to ensure that Regal Heights clearly understood that the original service letter was, indeed, a true error.

75. By this time, several weeks had elapsed, and Ms. Roberts's reputation, as well as her career, were irreparably damaged.

76. In delaying and failing to act, Defendants displayed gross negligence and reckless indifference as to whether their actions had caused damage to the career and reputation of Ms. Roberts.

## COUNT I – DEFAMATION PER SE

77. Plaintiff incorporates paragraphs 1 – 76 as if they had been asserted here.

78. Defendants knew the information published to Regal Heights was false, or should have known the information was false through exercise of due diligence.

79. Defendants were under contract not to disclose any information to a prospective employer other than giving a neutral reference.

80. A neutral reference does not include the publication of defamatory information.

81. Defendants intentionally published the defamatory information to another employer.

11

82. Plaintiff was damaged in that her career and reputation were actually harmfully affected.

83. Such statements as alleged herein certainly tended to blacken Plaintiff's reputation or expose her to public hatred, contempt, or ridicule, or injure her business or profession.

84. Publication was by Defendants to Regal Heights and to its managers.

85. The publication referred to Ms. Roberts, Defendants' former employee and the person then employed by Regal Heights.

86. Regal Heights and its managers understood the defamatory character of the communication, evident from their confronting her, interrogating her, and terminating her employment.

87. Regal Heights and its managers understood it applied to Ms. Roberts, since they confronted, interrogated, and terminated Ms. Roberts.

88. Plaintiff was injured because she was shocked and embarrassed when Regal Heights and its managers confronted and interrogated her, and when she was terminated, her reputation and career have been blackened, and she has suffered severe mental anguish.

89. Defendants' actions and, particularly, their subsequent delay and failure to act constituted gross negligence and reckless indifference.

90. Ms. Roberts continues to suffer from mental anguish, continues to experience obstacles in obtaining employment, and continues to encounter colleagues and others in the community in whose minds her reputation has been sullied.

91. Defendants Jason Auge and Betsy Robles, as agents and employees of Spruce Manor, Northern, and Extendicare and acting within the scope of their employment, are liable for their actions in directly causing the damage to Ms. Roberts's career and reputation.

92. Defendants Spruce Manor, Northern, and Extendicare are vicariously liable, through the acts their agents and employees, for damage caused to Ms. Roberts's career and reputation.


WHEREFORE, as a direct and legal result of Defendants' actions, Plaintiff April Roberts has suffered and sustained substantial damage and injury as fully described herein, and demands judgment against Defendants in an amount in excess of the compulsory arbitration amount, including compensatory and punitive damages, court costs, and attorney fees.

Respectfully Submitted,
WERNER LAW GROUP


Date: June 24, 2014

Stephen S. Werner, Esq.
Supreme Court ID No. 316303
P.O. Box 4886
Harrisburg, PA 17111
(717) 253-9900

13

APRIL L. ROBERTS                    :   IN THE COURT OF COMMON PLEAS
                                    :   BERKS COUNTY, PENNSYLVANIA
        Plaintiff                   :
                                    :
              v.                    :   No. 2014-CV-14865
                                    :
                                    :
SPRUCE MANOR NURSING &              :
REHABILITATION CENTER;              :   CIVIL ACTION -- LAW
NORTHERN HEALTH FACILITIES,         :
INC.; EXTENDICARE HEALTH            :   TORTS -- DEFAMATION
SERVICES, INC.; JASON AUGE;         :
BETSY ROBLES                        :   JURY TRIAL DEMANDED
                                    :
        Defendants

## VERIFICATION

I, APRIL L. ROBERTS, hereby verify that the information in the foregoing
Complaint is true and correct to the best of my knowledge, information, and belief.  I
also understand that false statements made herein are subject to the penalties of 18 Pa.
C.S. § 4904, relating to unsworn falsification to authorities.


Date:  06/17/2014                          _April L. Roberts_
                                           APRIL L. ROBERTS
                                           Plaintiff

APRIL L. ROBERTS           :  IN THE COURT OF COMMON PLEAS

                                  :  BERKS COUNTY, PENNSYLVANIA

      Plaintiff              :

                                    :  No. 2014-CV-14865

       v.                  :

                                    :

SPRUCE MANOR NURSING &     :

REHABILITATION CENTER;     :  CIVIL ACTION -- LAW

NORTHERN HEALTH FACILITIES,  :

INC; EXTENDICARE HEALTH    :  TORTS -- DEFAMATION

SERVICES, INC; JASON AUGE;   :

BETSY ROBLES              :  JURY TRIAL DEMANDED

                                    :

      Defendants         :

## <u>CETIFICATE OF SERVICE</u>

    I, Stephen S. Werner, do hereby certify that on 24th day of June , 2014, I caused a true and correct of this Complaint to be forwarded to the Sheriff's Office of Berks County for service upon the following in compliance with Pa.R.C.P. 400 et seq.

                                WERNER LAW GROUP

Date: June 24, 2014

                                Stephen S. Werner, Esq.

                                Supreme Court ID No. 316303

                                P.O. Box 4886

                                Harrisburg, PA 17111

                                (717) 253-9900

Spruce Manor Nursing and Rehab Services
Northern Health Facilities, Inc.
Extendicare Health Services, Inc.
Jason Auge, NHA
Betsy Robles
220 South 4th Avenue
West Reading, PA 19611
*Defendants*

# EXHIBIT "B"

# CONFIDENTIAL SETTLEMENT AGREEMENT
## AND GENERAL RELEASE

This Confidential Settlement Agreement and General Release ("Agreement") is entered into by and between Grievant April Roberts ("Roberts"), SEIU Healthcare Pennsylvania, CTW, CLC ("Union"), and Extendicare Health Services, d/b/a Spruce Manor ("Company").

On or about June 27, 2011, Roberts filed a grievance against the Company with the Union ("Grievance") protesting the termination of her employment.

During recent discussions between the Company, Union and Roberts, the Company agreed to allow Roberts to resign her employment.

Roberts certifies that she has had a reasonable period of time to consider this Agreement and consult with her union or an attorney of her choice and decide whether to sign it.

The Parties wish to enter into this Agreement to settle all matters alleged in the Grievance and all other potential claims Roberts may have against the Company.

1.      Consideration.  In consideration of the mutual promises contained herein, and intending to be legally bound, the Company agrees to the following:

a.      The Company will pay Roberts Two Thousand, Seven-Hundred and Fifty Dollars ($2,750.00) less withholdings and deductions.  A check made payable to Roberts in the agreed-to amount will be mailed to her within 15 days of the Company's receipt of a signed Agreement.

b.      The Company agrees that if contacted by prospective employers it will provide Roberts with a neutral job reference providing only the position she held, rate of pay and dates of employment.

2.      Waiver and Release of All Claims by Roberts.  Roberts, on behalf of herself, her dependents, heirs, executors, administrators, assigns, and successors, fully, finally and forever releases and discharges the Company, its current and former parents, subsidiaries and affiliates, and their predecessors, successors, assigns, representatives, and current and former officers, directors, agents and employees and the Union, its officers, agents, and employees (collectively the "Released Parties") from any and all claims and rights of any kind that she may have, whether now known or unknown, arising at any time before or upon her execution of this Agreement.  These claims and rights released include, but are not limited to, claims asserted in her Grievance (referenced above), as well as claims under Title VII of the Civil Rights Act of 1964, as amended, the Americans With Disabilities Act, the Family and Medical Leave Act, the Pennsylvania Human Relations Act, the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act, the Employee Retirement Income Security Act, claims for misrepresentation and fraud, claims for the intentional infliction of emotional distress, claims for defamation, any and all claims to any form of compensation, commission, bonus, vacation pay, severance pay, sick pay, overtime pay, any right to participate in and recover damages (or any other form of relief) in any class or related action, whether brought individually or by any governmental agency, or any benefits that she has, had or may ever have arising out of or in connection with her employment by the Company, or separation from the Company, arising

1

before the execution of this Agreement, and all other federal, state, and local statutory and common law, including claims for attorneys' fees and costs.

Nothing in this Agreement is intended to or does: (1) impose any condition, penalty or other limitation affecting Roberts's right to challenge this Agreement; (2) constitute an unlawful release or waiver of any of Roberts's rights under any laws; (3) waive or release any claim that arises after the Agreement is signed; (4) waive or release Roberts's right to file an administrative charge with any local, state or federal administrative agency with jurisdiction to receive and investigate Roberts's claims under applicable law, but only to the extent the basis for such charge arises after the execution of this Agreement, although Roberts does waive and release her right to recover any monetary or other damages under such applicable law, including but not limited to compensatory damages, punitive damages, liquidated damages, or attorneys' fees and costs; or (5) prevent or interfere with Roberts's ability or right to provide truthful testimony, if under subpoena or court order to do so, or respond as otherwise provided by law.

3.    <u>Confidentiality, Non-Disclosure</u>.  Except as required by law or court order, or in an action to enforce this Agreement, Roberts shall not disclose the terms of this Agreement to any person other than her spouse and attorneys or advisors, each of whom shall agree, before such disclosure, to protect the confidentiality of all such information.

4.    <u>No Reemployment</u>.  Roberts agrees not to apply in the future for any employment with the Company, its parent, or with any subsidiary, or division of the Company.

5.    <u>Entire Agreement</u>.  This Agreement contains the entire agreement and understanding between the Released Parties with respect to any and all disputes or claims that Roberts has, or could have had, against the Released Parties or any single Released Party as of the date this Agreement is executed.  This Agreement shall not be changed unless in writing and signed by Roberts, the Union and the Company.

6.    <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect any other provisions, which shall remain in full force and effect.

7.    <u>Knowing and Voluntary Settlement</u>.  Roberts represents and warrants that she has carefully read and fully understands all of the provisions and effects of this Agreement and signs it with full understanding of its significance and intending to be legally bound by it.  Finally, Roberts represents and warrants that she has entered into this Agreement freely and voluntarily based on her own judgment.

8.    <u>Time of Consideration</u>.  Roberts acknowledges that she has been allowed a reasonable opportunity of at least twenty-one (21) days to consider this Agreement.  Roberts further acknowledges that she is over the age of eighteen (18) years and is legally competent to enter into this Agreement; that she has read this Agreement and has had sufficient time and opportunity to review or discuss it with counsel; that Roberts fully understands the meaning and effect of the terms of the Agreement; and, that Roberts executes this Agreement of her own free will and deed, and acknowledges that it was freely negotiated and entered into without fraud, duress or coercion.

9.    <u>Revocation and Effective Date</u>.  Roberts expressly agrees and understands that for a period of seven (7) days following the execution of this Agreement she has the right to revoke

2

and cancel this Agreement by providing notice, in writing, to legal counsel for the Company, Jeffrey Wilson, Esquire, Buchanan Ingersoll & Rooney, PC, 20th Floor, One Oxford Centre, Pittsburgh, Pennsylvania 15219. If Roberts does not notify counsel for the Company within seven (7) days of execution, this Agreement will become effective and enforceable on the eighth (8th) day following the execution date below. If Roberts does so revoke, this Agreement shall be null and void, and the Company shall have no obligation to take any of the actions described in Paragraph 1.

**PLEASE READ CAREFULLY. THIS CONFIDENTIAL SETTLEMENT AGREEMENT AND GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

**I HAVE CAREFULLY READ AND FULLY UNDERSTAND ALL OF THE PROVISIONS OF THIS AGREEMENT AND HAVE HAD AN OPPORTUNITY TO DISCUSS ALL MY CONCERNS ABOUT THIS AGREEMENT WITH A PRIVATE ATTORNEY.**

IN WITNESS WHEREOF, April Roberts, the Union, and Extendicare Health Services, have knowingly and voluntarily executed this Confidential Settlement Agreement and General Release as of the dates set forth below.

Extendicare Health Services

By: _____

Date: 3/26/2012

On behalf of the Union

By: _____

Date: 3/8/12

[This space intentionally left blank.]

3

**GRIEVANT'S SIGNATURE IF SIGNED BEFORE MARCH 27, 2012.**

I hereby certify that I fully understand the terms set forth in the above Agreement, and that I have been given at least 21 calendar days to decide whether to accept the terms listed in the Agreement. I desire to waive the balance of the 21-day period and to sign the Agreement on the date listed below and I agree to the terms of this Agreement.

_April L. Roberts_
April Roberts                                          Date: 3/8/2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**GRIEVANT'S SIGNATURE IF SIGNED ON OR AFTER MARCH 27, 2012.**

I hereby certify that I fully understand the terms set forth in the above Agreement, and that I have been given at least 21 calendar days to decide whether to accept the terms listed in the Agreement. I agree to the terms of this Agreement.

_____                              Date:
April Roberts

4

# EXHIBIT "C"

RECEIVED
JAN 0 6 2014
BY.

## SERVICE LETTER

The provisions of 19 Del. C. §708 require that we obtain a service letter from you as an employer or former employer of the person named below. The provisions of 19 Del. C. §708 also require any employer who receives a request for a service letter to provide the information on this form within ten (10) business days from receipt of the request. This law provides for penalties of $1,000 - $5,000 for failing to disclose all applicable and available truthful information known to the employer.

**TO BE COMPLETED BY EMPLOYER REQUESTING SERVICE LETTER.**

Name of Business/Employer requesting service letter: _Regal Heights Healthcare_

Address of Business/Employer: _6525 Lancaster Pike_ _Hockessin, DE  19707_    Attn: Human Resources Fax: 302-998-3788

Type of Business of Employer requesting service letter (Check one):

[✓] Health Care Facility        [ ] Child Care Facility

Name of applicant: _APRiL Roberts_

Social Security Number: _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_

Dates of Employment: From: _1/3/2007_ To: _6/29/2011_

**TO BE COMPLETED BY EMPLOYER RECEIVING SERVICE LETTER REQUEST.**

The above-named person has applied for employment/licensure with our organization. The applicant indicated on his/her application that s/he was or is employed by you and has signed an authorization and release form that permits you to truthfully answer these questions without liability.

1.  Complete Name of Business/Employer: _SPRULL MANOR Nursing & Rehab_

    Address of Business/Employer: _220 S. 4th Ave_

    _Reading, Pa 1961_

    Type of Business: _Nursing Home_

2.  Dates of Service for employee: From: _1/3/07_ To: _6/29/11_

    If this information is not available, please explain: _____

3.  Please answer the following questions:

    A. Type of service performed by the person during the course of his/her employment.
       (Please Check One.)

    [X]    The employee was directly involved on a daily or frequent basis providing services and/or care to clients/patients/residents/children.

☐ The employee was not directly involved providing services and/or care to clients/patients/residents/children on a daily or frequent basis, but did occasionally provide some care and/or services.

☐ The employee did not provide services and/or care to clients/patients/residents/children, but did have some contact with them.

☐ The employee had no contact with clients/patients/residents/children.

☐ This information is not available. (Please Explain.)
_____

B.   Reason for separation from service (please check one).

☐ Laid-off   ☐ Resigned   ☐ Resigned in lieu of discharge

☒ Discharged   ☐ Abandoned Position   ☐ Other (Specify)_____

☐ Information not available (Explain) _____

C.   Information relating to employee's performance (please check all statements which apply to this person and circle action/s taken.)

☐ The employee was counselled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving his/her violent behavior or threats of violence in the workplace.

☒ The employee was counselled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving abuse of patients/clients/residents/children.

☐ The employee was counselled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving negligence/neglect of patients/clients/residents/children.

☐ The employee was never counselled, warned, reprimanded, suspended or discharged as a result of reasonably substantiated incidents involving violent behavior in the workplace, abuse or negligence/neglect of patients/clients/residents/children.

☐ Not applicable to this employee. (Please Explain.) _____

4.   (Optional) I would rehire this individual   ☐ yes   ☒ no

I hereby swear/affirm that the information provided above is a full and complete disclosure of the facts required, and that the information is true and correct to the best of my knowledge and belief.

*Bugsy Robles - HR/Payroll*
Printed name/title of person completing the form

_____        1/30/14
Signature                         Date

This form is provided by the Delaware Department of Labor. Reproduce additional copies as needed.

## REGAL HEIGHTS HEALTH CARE

### SERVICE LETTER RELEASE FORM

In order to comply with 19 Del. C. § 708, all applicants for employment must provide a list of their current and previous employers for the past five years. The purpose is to enable REGAL HEIGHTS to obtain State required Service Letters.

I understand that, if hired before receipt of the Service Letter report(s), my employment shall be conditional and contingent upon receipt of said report(s).

Applicant Name: _APRIL ROBERTS_
Address: _20 Korda Drive_    City: _Newark_   State: _DE_   Zip Code _19713_
Telephone: _717-341-0848_
Social Security # _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_

Employment History:

1. Business Name: _Valley Healthcare Center_
   Address: _____   City: _San Bernardino_   State: _CA_   Zip Code ___
   Telephone # _909-886-5291_
   Dates of Employment: From: _12/12_      To: _9/13_

2. Business Name: _Spruce Manor Nursing & Rehab_
   Address: _____   City: _West Reading_   State: _PA_   Zip Code ___
   Telephone # _____
   Dates of Employment: From: _____      To: _____

3. Business Name: _____
   Address: _____   City: _____   State: ___  Zip Code ___
   Telephone # _____
   Dates of Employment: From: _____      To: _____

4. Business Name: _____
   Address: _____   City: _____   State: ___  Zip Code ___
   Telephone # _____
   Dates of Employment: From: _____      To: _____

### Please Use Reverse Side for Additional Past Employers

I hereby authorize the above employers to fully release any and all information pertaining to the facts of my employment. I swear that I have fully and completely disclosed my employment history. I understand that failure to provide complete disclosure is a violation of 19 Del.C.§ 708 with civil penalties of not less than $1,000 nor more than $5,000.

_April L. Roberts_                    _11/21/13_
Applicant Signature                   Date

Rev. 6-01-06

# EXHIBIT "D"

# AGREEMENT


# BETWEEN


# NORTHERN HEALTH FACILITIES INC.
# D/B/A
# SPRUCE MANOR NURSING &
# REHABILITATION CENTER


# AND


# SEIU HEALTHCARE PENNSYLVANIA,
# CTW, CLC


# APRIL 1, 2013 – MARCH 31, 2016

## TABLE OF CONTENTS

ARTICLE  1   RECOGNITION ...................................................... 1

ARTICLE  2   UNION SECURITY AND DUES CHECKOFF .......... 3

ARTICLE  3   NONDISCRIMINATION ........................................... 5

ARTICLE  4   UNION ACTIVITY, VISITATION, AND BULLETIN
             BOARDS ................................................................. 6

ARTICLE  5   PROBATIONARY EMPLOYEES ............................. 8

ARTICLE  6   SENIORITY ............................................................. 8

ARTICLE  7   WAGES ................................................................... 12

ARTICLE  8   PENSION AND 401K................................................ 15

ARTICLE  9   HOURS OF WORK AND OVERTIME...................... 16

ARTICLE 10   PART-TIME BENEFITS ........................................... 21

ARTICLE 11   HOLIDAYS .............................................................. 22

ARTICLE 12   VACATIONS............................................................ 24

ARTICLE 13   SICK LEAVE........................................................... 26

ARTICLE 14   PAID LEAVE........................................................... 28

ARTICLE 15   UNPAID LEAVE...................................................... 29

ARTICLE 16   HEALTH AND WELFARE ....................................... 30

ARTICLE 17   MANAGEMENT RIGHTS........................................ 37

ARTICLE 18   DISCIPLINE AND DISCHARGE ............................. 38

ARTICLE 19   GRIEVANCE PROCEDURE ................................... 40

ARTICLE 20   ARBITRATION........................................................ 41

ARTICLE 21   STAFFING.............................................................. 42

ARTICLE  22     EFFECT OF LEGISLATION-SEPARABILITY .......... 43

ARTICLE  23     HEALTH AND SAFETY ........................................ 44

ARTICLE  24     SUCCESSORSHIP AND JOB SECURITY.............. 46

ARTICLE  25     LABOR-MANAGEMENT COMMITTEE................... 47

ARTICLE  26     NO STRIKE OR LOCKOUT .................................... 48

ARTICLE  27     MISCELLANEOUS ............................................... 48

ARTICLE  28     TRAINING AND EDUCATION FUND ..................... 51

ARTICLE  29     DRUG AND ALCOHOL SUBSTANCE
                ABUSE POLICY ................................................... 52

ARTICLE  30     DURATION............................................................ 59

APPENDIX A     DUES CHECK-OFF AUTHORIZATION CARD/
                SOLIDARITY-POLITICAL ACTION CARD.............. 60

LETTER OF AGREEMENT .................................................................. 62

STATEMENT OF UNDERSTANDING................................................. 66

SCHEDULE 1     .................................................................................. 68

HSG LETTER OF AGREEMENT ........................................................ 71

MEMORANDUM OF UNDERSTANDING ........................................... 72

## AGREEMENT

This Agreement is made and entered into by and between Northern Health Facilities, Inc., d/b/a Spruce Manor Nursing and Rehabilitation Center, located at 4th and Spruce Streets, West Reading, PA 19611 (hereinafter the Employer) and SEIU Healthcare Pennsylvania, CTW, CLC, located at 1500 North Second Street, Harrisburg, PA 17102 (hereinafter the Union), acting herein on behalf of the employees of the said institution, as hereinafter defined, now employed and hereinafter to be employed and collectively designated as the employees.

## WITNESSETH

WHEREAS, the Employer recognizes the Union as the collective bargaining representative for the employees covered by this Agreement as hereinafter provided; and

WHEREAS, it is the intent and purpose of the parties hereto that this Agreement promote and improve the mutual interests of the patients of the Employer, as well as of its employees and to avoid interruptions and interferences with services to patients and to set forth their agreement covering rates of pay, hours of work, and conditions of employment.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE 1
## RECOGNITION

1.1   The Employer recognizes the Union as the sole and exclusive collective bargaining representative of all of the employees in the following bargaining unit(s): all full-time and part-time service and maintenance employees, including nurses' aides, certified nursing assistants, orderlies, dietary, housekeeping, laundry and maintenance employees, ward clerks, physical therapy aides, cooks, and all full-time and regular part-time licensed practical nurses (LPNs), including LPN charge nurses and LPN medication treatment nurses.

1

(a) Excluded from the aforesaid bargaining unit(s) are all RNs, maintenance supervisors, dietary supervisors, occupational therapists, office clericals, guards, supervisory, confidential, executive and managerial employees, part-time employees who are regularly scheduled to work less than eleven (11) hours per week, and temporary employees as defined herein. To become eligible for inclusion in the bargaining unit, an employee must be regularly scheduled and actually work more than ten (10) hours per week for ten (10) consecutive pay periods.

(b) A temporary employee is one who is hired for a period of up to three (3) months and is so informed at the time of hire, and who is hired for a special project or to replace an employee on leave or vacation. The said three (3) month period may be extended up to an additional three (3) months or the length of leave of the employee being replaced, with the consent of the Union, which shall not be unreasonably withheld; however, such employee shall become a member of the Union after the expiration of the initial three (3) month period. Temporary employees who become either part-time or full-time employees, in the same department in which they have been working as temporary employees, as covered under this Agreement, shall have their continuous employment time as a temporary employee counted toward their probationary period. If a temporary employee becomes part time or full time in a department other than the one in which they have been working as a temporary employee, they shall be considered as probationary for a period of seventy-five (75) days in the new department, as outlined in Article 6.1 of this Agreement.

(c) Temporary employees shall not be eligible for any transfers, leaves of absence, sick leave, vacations, holidays, or any vacancy filling procedures established by this Agreement.

1.2   Whenever the word "employee" is used in this Agreement, it shall be deemed to mean the employees in the bargaining unit(s) covered by this Agreement, as defined in Article 1.1 hereof.

1.3   The Employer agrees that there shall be no interchange or temporary transfer of bargaining unit employees to a nonunion home owned by the Employer or one of its affiliates.

2

1.4   At the time a new employee subject to this Agreement is hired, the Employer shall deliver to said employee a written notice that the Employer recognizes and is in contractual relations with the Union and quoting or paraphrasing the provisions of Articles 2 and 3 of this Agreement.

ARTICLE 2
UNION SECURITY AND DUES CHECKOFF

2.1   Effective upon ratification, it shall be a continuing condition of employment with the Employer that all employees covered by this Agreement shall be and remain members in good standing in the Union or pay a representation fee to the Union.

2.2   New employees, after completing their first thirty (30) calendar days of employment, shall become and remain members in good standing with the Union or pay a representative fee to the Union.

2.3   Starting not earlier, than the first pay period of the first full month of employment, after completing their first thirty (30) calendar days, and upon receipt of a voluntary written authorization from an employee, the Employer shall deduct each month from the wage dues, assessments, and initiation fees or representation fees as fixed by the Union.  The authorization form to be signed by employees is attached hereto as Exhibit A and made a part of this Agreement.  The employer shall submit to the Union an original copy of the completed Membership Application/Authorization form prior to the deduction of regular monthly dues.

2.4   The Employer shall not be obligated to make deductions of any kind from any employee, who, during the pay period in which the dues are deducted from the employee, shall have failed to receive sufficient wages to equal the deductions.  The initiation fee shall be deducted in two (2) equal amounts on two (2) consecutive months along with the dues deductions.

2.5   Except as provided herein, an employee who fails to join the Union, maintain Union membership or pay a representation fee shall, within twenty (20) calendar days following receipt of a written demand from the Union to the Employer requesting discharge, be discharged if during such period the required dues, Initiation fees and/or representation fees have not been tendered.

3

2.6   The Employer agrees to furnish SEIU Healthcare PA at an address identified by the Union, in writing, as the Union's main office, each month with the names of newly-hired employees, their addresses, phone numbers, Social Security numbers, job classifications, departments or work areas, their dates of hire, and names of retired or terminated employees (designated as either retired or terminated), together with their dates of termination or retirement, and names of employees on leaves of absence, together with the dates such leaves of absence began and ended.

2.7   The Employer agrees to make a payroll deduction monthly from an employee's pay for the SEIU Healthcare PA Solidarity-Political Action Fund upon written authorization of any employee covered under this Agreement.  The Employer will remit the same by separate check including a report with the Employees name and amount dedicated to SEIU Healthcare PA Solidarity-Political Action Fund at an address identified by the Union, in writing, as the Union's main office.  Said authorization of employee shall be in the form annexed here to as Exhibit A.

2.8   The Employer shall remit to the Union by check no later than the fifteenth of the month, all deductions for union dues or representation fees, initiation fees, and assessments made from the wages of employees for the preceding month.  The Employer shall use reasonable efforts to remit to the Union by electronic transfer the following information for each employee whether or not deduction is made:

a)   job classification;
b)   department or work area;
c)   hourly rate;
d)   number of hours worked and the gross earnings that the dues deduction is based on;
e)   full, regular part-time, per diem, etc. status;
f)   month the deduction is based on;
g)   name;
h)   initiation fees listed separately;
i)   assessments listed separately;
j)   check payable to SEIU Healthcare PA and sent to an address identified by, the Union, in writing, as the Union's main office; and

4

k)   a reason dues is not deducted (e.g., Leave of Absence, termination, FMLA, etc.)

2.9  It is specifically agreed that the Employer assumes no obligation, financial or otherwise, arising out of any of the provisions of this Article, and the Union hereby agrees that it will indemnify and hold the Employer harmless from any claims, actions, or proceedings by an employee arising from deductions made by the Employer hereunder, including the costs of defending against such.  Once the funds are remitted to the Union, their disposition thereafter shall be the sole and exclusive obligation and responsibility of the Union.

ARTICLE 3
<u>NONDISCRIMINATION</u>

3.1   Neither the Employer nor the Union shall discriminate against any applicant or employee either in hiring, promoting or assigning to positions, or in regard to any other term or condition of employment because of race, color, national origin, religious or political belief, sex, sexual orientation, age, handicap or disability, military service, marital status, or activity on behalf of the Union as governed by prevailing law.

3.2   The parties recognize that under the Americans with Disabilities Act of 1990 and the Pennsylvania Human Relations Act, the Employer is required to make reasonable accommodations for qualified individuals with disabilities. The parties recognize that in making these reasonable accommodations in accordance with the statutes, the Employer may be required to take actions which are not consistent with the provisions of this Agreement.  Prior to taking any such action, the Employer agrees to meet and discuss the issue with the Union. Upon agreement of the parties, the applicable provisions of this Agreement shall be waived in order to make such reasonable accommodation and such waiver shall not be subject to the grievance and arbitration provisions of this Agreement.

3.3   References to he, she, him, her, etc. are not intended to specifically refer to one gender or another but are used solely as generic reference to bargaining unit members.

ARTICLE 4
UNION ACTIVITY, VISITATION, AND BULLETIN BOARDS

4.1  An authorized representative of the Union shall, upon prior notice to the administrator or his designee, have reasonable access to the Employer's premises for the purpose of conferring with the Employer, delegates of the Union and/or employees, and for the purpose of administering this Agreement. Immediately, when a Union representative enters the Employer's premises, he shall notify the administrator, or person in charge, of his visit so that his activities do not interfere with patient care or efficient operation of the Facility. The Employer will not unreasonably withhold permission from the Union representative to accomplish the purpose of his visit. The Union representative shall enter patient care areas only when accompanied by a representative of Administration. A Union delegate who must visit a department other than his/her own for the purpose of investigating a grievance shall be allowed to do so with the mutual permission and agreement of the department heads involved. Such permission shall not be unreasonably denied.

4.2  The Employer shall furnish and install one bulletin board which shall be used solely for the purpose of posting Union notices. This bulletin board shall be located conspicuously and at a place readily accessible to the workers in the course of employment.

4.3  Leadership Assembly Meetings  The work schedules of employees elected as Union delegates, and one (1) employee elected to the executive board, shall be adjusted to permit their attendance at leadership assembly or executive board meetings, as applicable, provided that the Union gives the Employer's administrator thirty (30) calendar days' advance notice in writing of such meeting(s), provided that the Employer's operation shall not be impaired. Union delegates and a member of the executive board shall be given the opportunity to work a full schedule of days, as offered by the Employer and at the employee's option, during the pay period in which the meeting falls by offering the employee work on the employee's regular shift for dates on which the employee is not customarily scheduled. The Employer and Union shall cooperate to assure adequate staffing during such meetings.

6

4.4   Employees who serve on various Health & Safety or Quality Assurance Committees with the Employer and who attend said meetings during non-working time shall be paid for those hours.

4.5   The Employer will notify the person(s) designated by the Union forty-eight (48) hours in advance of the employees orientation and will allow the person(s) designated fifteen (15) minutes unpaid time to speak with the new employees at the end of the first or second day of orientation, as determined by the Employer.

4.6   The Employer shall be notified in writing of the names of delegated employees that have been authorized to act on behalf of the Union as delegates, and this list shall be kept current. Those identified persons shall be permitted to post approved notices during working hours but not working time. All notices must be reviewed by the Employer and approved for posting. These approvals will not be unreasonably denied.

4.7   When a delegate finds it necessary to enter a department of the nursing home other than his own department, he shall first secure the permission of his department head and, when he arrives in the other department, will secure permission of that department head. Such visit shall not interfere with the operation of the nursing home.

4.8   No employee shall engage in any Union activity, including the distribution of literature, which could interfere with the performance of work during his/her working time or in any patient care area.

4.9  Delegates shall be paid for time spent in grievance meetings understanding that meetings will be held during the delegates' regularly scheduled shift times.

4.10  The Employer shall provide five (5) paid days per calendar year for Union Activity including, but not limited to, Election Day, lobby days, trainings, and Delegate/Leadership Assemblies.  The Union shall provide the names and dates requested off at least fourteen (14) calendar days in advance to the Employer.

## ARTICLE 5
## PROBATIONARY EMPLOYEES

5.1   Newly hired and rehired employees shall be considered probationary for a period of ninety (90) calendar days from the date of employment, excluding time lost for sickness and other leaves of absence.

5.2   During or at the end of the probationary period, the Employer may discharge any such employee at will and such discharge shall not be subject to the grievance and arbitration provisions of this Agreement.

5.3   Probationary employees are prohibited from extra work opportunities during their initial orientation period as determined by the Employer until other employees have been offered the opportunity to work.

5.4   Probationary employees are ineligible for any transfers, leaves of absence, sick leave, vacations, holidays or any vacancy filling procedures established by this Agreement.

5.5   The Probationary period may be extended up to an additional thirty (30) days by mutual consent in writing of both parties. Such extensions shall not be unreasonably denied by either party. In the event probation is extended, the Employer shall provide to the Union, in writing, prior to the end of the ninety (90) calendar day probationary period, the reasons for the extension.

## ARTICLE 6
## SENIORITY

6.1   Bargaining unit seniority is defined as the length of time an employee has been continuously employed in any capacity in the institution. Classification seniority shall be defined as the length of time an employee has worked continuously in a specific job classification within a department.

6.2   Accrual  An employee's seniority shall commence after the completion of his probationary period and shall be retroactive to the date of his last hire.

8

(a) Bargaining unit seniority shall accrue during a continuous authorized leave of absence without pay up to one (1) year or for the period of maternity leave; during an authorized leave of absence with pay, during a continuous layoff not to exceed the lesser of one (1) year or the length of any employee's continuous employment, if the employee is recalled into employment.

(b) Classification seniority shall accrue during the periods specified in (a) above and during the time an employee works in a specific job classification.

(c) Temporary employees, as defined in Article 1.1 (b), shall have no seniority during the time they occupy the status of temporary employees, but should any temporary employee become a permanent employee, then his seniority shall be retroactive to the date of employment.

6.3   Loss of Seniority   An employee's seniority shall be lost when he:

(a) terminates voluntarily.

(b) is discharged for cause.

(c) fails to return from authorized leave of absence at specified time when physically able to do so. Employee to notify the Employer if unable to report on expiration of leave of absence.

(d) fails to return from a layoff within seven (7) days after receipt of a certified letter from the Employer offering reinstatement. A copy of the letter will be sent to the Local Union.

(e) is laid off for a period of one (1) year or a period exceeding the length of the employee's continuous service, whichever is less.

(f) while on a leave of absence from the nursing home, takes another job during his normal nursing home working hours without written permission of the administrator.

(g) falsifies the reason for a leave of absence whether such leave is paid or unpaid.

6.4   <u>Layoff</u>   In the event a layoff becomes necessary within a job classification, temporary employees within that classification will be the first to be laid off; if additional layoffs are necessary, then probationary employees within that job classification shall be laid off without regard to their individual periods of employment. Nonprobationary employees shall be the next to be laid off on the basis of their classification seniority.

(a) In the event an employee is scheduled to be laid off in one department and there exists a vacant position in another department which the employee has the ability and qualifications to perform, then bargaining unit seniority shall prevail in assigning such employees scheduled to be laid off to such vacant jobs.

(b) For the purpose of layoff, this provision is intended to supersede Section 6.7. When an employee fills such a vacant position, he shall be paid the wage rate of said vacancy.

(c) In the event that a layoff is to occur, the Employer shall notify the affected employees and the Union in writing at the earliest possible time prior to such layoff. At the request of either party, the Union and the Employer shall meet to discuss alternate methods of effecting the desired ends of the Employer.

6.5   <u>Recall</u>   Whenever a vacancy occurs in a job classification, employees who are on layoff in that classification shall be recalled in accordance with their classification seniority in the reverse order in which they were laid off. If a vacancy occurs in a job classification where an employee in that classification has recall rights, then the laid off employee with the most bargaining unit seniority will be recalled if he has the ability and qualifications to do the work, and if not, the next senior qualified employee will be recalled, and so on. When an employee is recalled to a job other than his regular job and which he is qualified to perform, he shall receive the rate for the job which he is performing. Probationary employees who have been laid off have no recall privileges.

6.6   When an employee resigns, and the Employer intends to fill the position, it shall be posted for bid within ten (10) days. If no employee bids for the position and it is not filled by a newly hired employee, the position shall remain posted on a list of unfilled positions until it is filled, or the Employer decides the position is no longer needed.

6.7   Vacancies   Where a vacancy occurs in a bargaining unit job, the Employer shall post notice of the vacancy for a period of four (4) workdays. Bargaining unit members interested in the vacancy must submit their bid in writing to the department head. Temporary openings created by a Leave of Absence of thirty (30) days or more shall be posted in accordance with this section. Only regular part-time employees shall be eligible to bid for such temporary openings. Employees granted temporary positions in accordance with this section shall return to their former positions (shift and unit) at the end of their temporary assignments.

(a) The Employer agrees to offer the position to the employee with the greatest job classification seniority, unless as between or among the employees who bid for the vacancy there is an appreciable difference in their ability to do the job. Disputes under this provision shall be subject to the grievance and arbitration provisions of the Contract.

(b) An employee who is offered and has accepted a new position as provided in paragraph (a) above, will serve a thirty (30) day probationary period on the new job without loss of bargaining unit status or bargaining unit seniority. If he is removed from the new job during the probationary period, he shall be returned to his former job at his former rate of pay without loss of classification seniority.

6.8   Seniority Lists   There shall be one (1) seniority list, combining full-time and regular part-time employees, issued every six (6) months, showing the employees' names, dates of hire, and classifications. A copy shall be sent to the Union, and a copy shall be permanently posted on bulletin boards. Seniority shall be determined as of the date of hire.

6.9   Application   Bargaining unit seniority shall apply in the computation and determination of eligibility for all benefits where length of service is a factor pursuant to this Agreement. Classification seniority shall apply in layoffs and recalls and for scheduling of vacations as herein provided and for purposes of filling vacant bargaining unit positions (transfers and promotions) which the Employer intends to fill.

6.10  It is agreed in principle that for the purpose of applying seniority to recalls and to vacant positions and to layoffs, employees in job classifications of similar types and requiring similar skills shall be grouped together.

(a) In the event of a layoff of any employee, there shall occur only one (1) bump in the home. The only employee who may be bumped by the employee originally scheduled to be laid off shall be the employee with the least seniority in the same classification. An employee who is bumped shall himself have no bumping rights.

(b) In the event of a layoff, an employee may volunteer to be laid off out of line of seniority, but such employee shall have no bumping rights as provided herein.

ARTICLE 7
WAGES

7.1  Except as may otherwise be provided in this Agreement, the wage rates and wage increases applicable and in force during the term of this Agreement are set forth on a schedule annexed hereto, made a part hereof, and designated "Schedule 1."

7.2  Unclassified Jobs  If the Employer should establish a new position or change the duties of any employee to such an extent that the employee's work does not fall within any classification covered by this Agreement and yet involves duties which render the employee subject to this Agreement, the wage rate of such employee shall be determined by negotiation between the Union and the Employer. If the parties are unable to agree on a wage rate, the matter shall be submitted to arbitration. Prior to the negotiation of the wage rate, the Employer shall submit to the Union the description of the new position or change in the duties of the existing position.

7.3  Payday is normally Monday. All paychecks shall be made available on departure for all employees on duty from 11:00 PM to 7:00 AM. All other employees shall receive their paychecks between the hours of 9:00 AM and 11:00 AM or 2:15 PM and 3:30 PM. The paycheck will be available by 2:00 PM on the prior Friday dated for that Friday before any Monday holiday that is a bank holiday.

12

Payroll errors – Employer mistakes of one (1) day or more in value shall be corrected within 72 hours provided the employee has no time card errors or missed punches in the same pay period.

7.4   <u>Training Pay</u>   Any CNA involved in training/mentoring another employee shall receive an additional one dollar ($1) per hour for such training.  The length of mentoring/training time shall be determined by the Employer. The trainers shall also serve as Mentors for new employees and will be responsible for the retention of the newly hired employee. When such employee successfully completes thirty (30) days of employment, the Mentor will receive fifty dollars ($50). When they complete ninety (90) days of employment, the Mentor will receive fifty ($50) dollars. When they complete six (6) months of employment, the mentor will receive one hundred dollars ($100). Mentors will be selected from among volunteers and will be selected based on the successful completion of their probationary period, the absence of any disciplinary actions – other than a Class I – over the past twelve (12) months, and no active attendance disciplinary actions.  All of the above being equal, bargaining unit seniority shall be the determining factor on a rotating basis.

For all other employees, a training rate of twenty cents ($.20) per hour shall be paid to individuals who are specifically scheduled to train only for the scheduled hours. A specific program checklist will be provided and completed by the individual training. The training rate does not cover the normal casual system of helping new employees.

7.5   All employees in the bargaining unit who regularly work on the second (2nd) and third (3rd) shifts shall be paid a shift differential of fifteen cents ($0.15) per hour.

Only LPNs regularly scheduled to work the second (2nd) shift shall continue to be paid a shift differential of forty cents ($0.40) per hour. Effective December 1, 1999, the LPNs shall be eligible to receive fifteen cents ($0.15) per hour shift differential for the third (3rd) shift.

7.6   <u>Weekend Rate Differential</u>   Effective for all current employees as of April 3, 1996, only for the job classification of care nurse, and only for the hours between 11:00 PM Friday through 11:30 PM Sunday, a rate differential shall be paid as follows:

The per hour minimum rate or forty cents ($0.40) per hour in addition to employee's regular hourly rate, whichever is greater, for all hours worked during the above stated hours.

The Friday hours included in this Article shall not be deemed the weekend for employees working on the 11:00 PM to 7:30 AM shift.

Care nurses regularly scheduled for the 11:00 PM to 7:30 AM shift shall be deemed to have a weekend from 7:00 AM Saturday morning to 7:30 AM Monday morning.

For employees hired after April 3, 1996, this weekend differential shall not apply except that after notification to the Union, the Employer, at its discretion, may implement this differential for employees hired after April 3, 1996.

7.7   When an employee performs any work in any day in a higher rated classification than that in which he is normally classified, he shall be paid at the higher rate of pay for all hours worked in the higher classification.

(a) If an employee works in a higher paying job classification in accordance with this section or in accordance with Section 8.10 of this Agreement, said employee shall not suffer any loss of benefits or seniority and shall retain her/his status as a member of the bargaining unit.

(b) Any bargaining unit employee who is requested by the Employer to work in a higher paying classification shall be paid in accordance with current practice.

7.8   No employee shall perform work at a higher classification for a period in excess of thirty (30) consecutive working days. At the end of such thirty (30) day period, the higher classified job in question shall be posted as a vacancy except when the employee who regularly performs that job is on leave of absence for illness or maternity and is expected to return to work, in which case the thirty (30) day period may be extended by the Employer. The Employer agrees not to abuse this provision.

## ARTICLE 8
## PENSION AND 401K

8.1  Effective August 1, 1993, full-time and regular part-time employees shall become eligible to participate in the Employer's 401(k) program under the same terms and conditions as are available for other Extendicare employees. The Employer shall match employee contributions to the 401(k) plan using a twenty-five percent (25%) matching formula ($0.01 for $0.04 in employee contributions) up to a maximum of six percent (6%) of the employees' base salary.

8.2  The Employer agrees to provide all employees covered by this Agreement with Pension benefits under the SEIU Industry Pension Fund (hereunder called "Pension Fund"). The Employer agrees to become and remain a participating Employer in the Pension Fund for as long as it has an obligation to contribute to the Pension Fund pursuant to the terms of this Collective Bargaining Agreement. The Employer agrees to participate in the Preferred Rehabilitation Plan.

Effective Upon ratification and for the duration of this Collective Bargaining Agreement, the Employer agrees that for each hour of pay paid to each employee to whom this Agreement is applicable for any reason provided for in this Collective Bargaining Agreement it will contribute to the Pension Fund the sum of twenty five cents ($.25) per hour.

The Employer agrees to furnish the Pension Fund with monthly remittance reports containing such information in such manner and on such forms as may be required by the Trustees of the Fund. Contributions and remittance reports shall be delivered to the Pension Fund on or before the fifteenth (15th) day of each month for the Proceeding month or before such other date as the Trustees may hereafter determine.

The Employer hereby agrees to be bound by the provisions of the Agreement and declaration of Trust establishing the Pension Fund ("Trust Agreement"), as it may be from time to time amended, by the Pension Plan and by all resolutions and rules adopted by the Trustees pursuant to the powers delegated to them by the Trust Agreement. The Employer hereby designates the Employer members of the Pension Fund Board of Trustees, or their duly selected successors, as its representatives on the Board.

The Employer and the Union agree to cooperate with the Administrator and Trustees of the Pension Fund in distributing plan booklets, literature and other documents and in obtaining and providing such census data as may be required by the Fund's Administrator.

The Employer agrees to permit the Trustees or any authorized agent of the Pension Fund, including independent auditors, to inspect and audit any of its records necessary to insure compliance with this Agreement or to otherwise enable the Trustees to discharge their legal responsibilities. In the event that an audit of the Employer's records discloses any underpayment of contributions required by this Agreement, the audit costs shall be payable by the Employer.

The Employer agrees that should it default or become delinquent in any of its obligations to the Pension Fund as set forth in this Article, it shall be liable for such penalties and costs as may be provided for by the Trust Agreement, the Pension Plan or resolutions of the Trustees including, but not limited to, a late payment penalty, interest, liquidated damages and all costs of collections including reasonable attorneys fees and accounting fees.

The undersigned parties acknowledge that the provisions of this article and the participation of the employees covered by it are subject to approval by the Trustees of the Pension Fund.  If the Trustees shall deny participation to the employees covered by this Collective Bargaining Agreement for any reasons, the parties agree to negotiate an alternative retirement savings program to which the contributions shall be made.

## ARTICLE 9
## HOURS OF WORK AND OVERTIME

9.1   The regular workweek for all full-time employees shall consist of forty (40) hours per week unless as otherwise provided herein. The regular workweek for part-time employees shall not exceed ten (10) days in a two (2) week period. Employees shall receive at least four (4) days off in each two (2) full calendar weeks, except in the event of overtime work.

The regular workday for all full-time employees covered by this Agreement shall consist of the number of hours in the regular workweek, divided by the number of days worked, exclusive of an unpaid lunch period.

9.2   There shall be two (2) fifteen (15) minute scheduled rest periods for regular full-time employees per eight (8) hour shift. There shall also be one (1) fifteen (15) minute paid scheduled rest period for all employees scheduled to work a four (4) hour shift. Such breaks must not interfere with required patient care. Scheduling of breaks shall be at management's direction.

9.3   Employees shall be entitled to every other weekend off. Management agrees to make every effort not to schedule regular full-time employees for more than six (6) consecutive days in a pay period.   Part-time employees who work a 7.5/8 hour shift and return to work another shift in the same day will be paid at overtime rates. The day starts at 7 a.m.

9.4   Employees shall be paid one and one-half (1-1/2) times their regular straight time hourly rate for authorized time worked in excess of eighty (80) hours per pay period or eight (8) hours per workday.

9.5   There shall be no pyramiding of overtime.

9.6   The Employer will assign all overtime on an equitable basis among qualified employees, whenever possible.

9.7   The Parties agree it is in the best interest of the Employer and the employees to eliminate mandatory overtime, but recognize it may be necessary in severe emergency situations beyond the Employer's control such as a state-declared snow emergency. The Employer agrees it is not their intent to increase the use of mandatory overtime above current levels and will work to reduce and eliminate its use where it exists.   Mandatory overtime shall be used only as a last resort, subject to applicable laws and Pennsylvania Law, Act 102. When it is necessary to replace scheduled employees who cannot report to work and until mandatory overtime is eliminated, the following steps will be taken:

1. The Employer shall first utilize the extra work sign-up list.

2. The Employer shall seek volunteers from those employees currently working.

3. Per Diem or Casual employees will be utilized if no other employees listed above are available.

Only after exhausting the three (3) steps above can the Employer require an employee to work extra hours. The extra hours shall be assigned to the junior employee working and shall be paid double time. An employee already working voluntary extra hours will not be mandated to work beyond the voluntary shift. Such assignment shall be made on a rotating basis in inverse order of seniority.

When a situation arises where the Facility needs to mandate an employee to work extra hours and an employee volunteers to work those additional hours, it will be noted as a mandatory assignment for that employee for purposes of pay and rotation. The Employer shall continue to seek replacements to limit the number of hours assigned. Mandatory overtime shall be limited to four (4) extra hours. Employees shall not be mandated more than once per month.

Documentation to establish that the Employer sought volunteers shall be maintained for thirty (30) days and available during that time for inspection by a Union delegate if a dispute occurs. The mandatory overtime list shall be posted by the time clock and list all employees in a job classification by seniority.

Management shall inform the employee whose turn it would be to work mandatory overtime of her status at the beginning of the shift. If mandatory overtime is necessary, management shall inform the employee whose turn it is as soon as possible.

9.8   Change of Starting Time   In the event that the Employer wishes to permanently change an employee's starting time, the Employer shall notify the employee in writing of such change one (1) week in advance. In the event that the Employer wishes to temporarily change an employee's starting time due to some emergency or other condition beyond the Employer's control, no

18

advance written notice is necessary, but the Employer will attempt to notify the employee as far in advance as possible. This provision shall not apply to probationary employees.

9.9   Employees shall work on the shift, shifts, or shift arrangements for which they were hired.   Whenever the employee requests a change of shift, approval of such request shall not be unreasonably withheld if a vacancy exists in the classification in which he is then working, and if more than one (1) employee applies, such change shall apply to the employee with the most classification seniority qualified to do the work. Notwithstanding the foregoing, an employee shall have preference in filling vacancies on another shift in the classification in which he is then working over new employees.

9.10   Premium holidays only shall count as time worked for purposes of overtime.

9.11   The following procedure will be utilized by the Employer in assigning additional hours of work:

(a) The Employer agrees to establish a voluntary call-in list for part-time employees who desire to work additional hours.  Part-time employees may sign up on the list and must indicate the shift(s) which they are willing to work within their classification. The Employer will post the list monthly.

(b) The Employer agrees to establish an additional voluntary call-in list for full-time employees who desire to work additional hours. Full-time employees may sign up on the list and must indicate the shift(s) which they are willing to work within their classification. The Employer will post the list monthly.

(c) The Employer will attempt to fill additional hours by first calling off duty employees on the part-time call in list in the order they signed the list.

(d) The Employer is not obligated to utilize any employee for additional hours of work if doing so would compel the Employer to pay overtime compensation, except as provided in (c) above.

(e) Any employee who refuses to work additional hours when called, or who is unavailable to work when called, will be dropped from the call-in list for the remainder of the month. The Employer agrees to call employees on the respective lists in rotational order, commencing with the first person to sign the list for the specific shift in question, then thereafter the next employee on the list. The Employer will call the employee at the telephone number listed in the employee's personnel file. The employee is responsible for maintaining an accurate telephone number for the Employer's use.

9.12   If a full-time employee is called in to work on a regularly scheduled day off, that employee will have the choice of either receiving overtime pay for the shift worked or receive straight time for the shift worked and receive an additional day off with pay provided the employee works his or her regularly scheduled days in the pay period. It is understood that each individual in each calendar year will be allowed two (2) exceptions of being off for a scheduled day for sickness without losing the premium or of being off for a scheduled day for sickness beyond two (2) with acceptable medical verification.

9.13   Employee Work Schedules shall be posted at the time clocks in a glass covered, locked cabinet.

9.14   <u>Reporting Time</u>   An employee who reports for work at the start of his regular assigned shift without being notified not to report shall, in the event no work is available, be compensated by payment of a total of four (4) hours' pay at the regular hourly rate of pay, or they may be assigned other work to do that they can perform at their applicable rate of pay. This provision shall not apply when failure to provide work is due to an Act of God or to other conditions or causes beyond the control of the Employer. Once the schedule is posted, it shall not be changed unless mutually agreed upon between the Employer and employee. The schedule shall be posted seventy-two (72) hours before going into effect.

9.15   Employees shall be permitted to switch days off with other employees in the same job classification. Pursuant to this section, the Employer and the Union shall develop a procedure for employees who wish to switch days off.

9.16   The scheduled shortage list will be posted on payday Monday before the end of the present schedule. Each shift will be able to review their own shortage list. On the Wednesday after payday Monday of the same week, all three (3) shifts scheduled shortage lists will be posted for all employees to review. The schedule coordinator will initial and date the scheduled shortage list indicating commitment to those hours. The schedule coordinator will enter names on the staffing sheet, the master and floor schedules. The shift shortage list will be updated every Monday. It will be the employees responsibility to check the shortage list for approval and/or floor schedule. A call off would be considered as any other call off on a scheduled shift. Care nurses and LPNs signing up for extra work will be expected to work the nursing unit to which they are assigned by the shift supervisor. All other employees will work the assigned hours in their classification.

## ARTICLE 10
## PART-TIME BENEFITS

10.1   Part-time employees covered by this Agreement shall receive fringe benefits hereunder on a pro rata basis. Benefits are prorated on the basis of actual hours worked during the previous anniversary year, plus all vacation and sick hours paid during the same period. For first year employees, proration will be determined based on the actual hours worked since the employee's date of hire.

The pro-ration formula looks at the hours paid in the previous year, divides it by 2080, and applies that percentage to the hourly rate.  For example, if they were paid for 1040 hours and have a regular pay rate of $12/hour, then 1040/2080 = 50% x  $12 = $6 is their prorated rate.

HOWEVER, prorated paid hours are accounted for as well.   For example, if in that previous year an employee was paid for 1040 regular hours and 40 vacation hours (which were paid at 50% of her rate), then the formula would be 1040 + (40*50%)/2080. So her total hours would be 1060, not 1080.  And 1060/2080=51%, so her rate would be $12*51% and her new prorated rate would be $6.12.

ARTICLE 11
HOLIDAYS

11.1   Eligible employees, upon completion of their probationary period, shall be entitled to the following paid holidays within each calendar year:

| | |
|---|---|
| New Years Day | Memorial Day |
| Martin Luther King | July 4th |
| National Holiday | Labor Day |
| Presidents Day | Thanksgiving Day |
| Easter Monday | Christmas Day |

11.2   Upon completion of the probationary period, each employee will be entitled to three (3) personal holidays in each anniversary year. Personal holidays shall normally be requested fourteen (14) days in advance. The fourteen (14) day notice may be waived for reasonable cause, although an employee shall provide at least two (2) hours notice when requesting personal days. The Employer may request written verifiable proof of emergency for using personal days with less than fourteen (14) days notice. Job classification seniority will be used to determine who may use a personal holiday when not all employees' requests can be granted. However, when a personal holiday is approved, it may not be canceled without the agreement of the employee and the department head.

.11.3   An employee who works on any of the legal holidays specified above shall be paid time and one-half (1-1/2) their regular straight time hourly rate for all hours worked on the holiday and shall, in addition, receive an additional day off with regular straight time pay within thirty (30) days of the holiday or an extra day pay in lieu thereof as determined by the Employer.

11.4   If a legal holiday, as specified in Article 11.1 above, falls during an employee's vacation, at the option of the Employer, the vacation shall be extended by one (1) day, or the employee shall receive an extra day's regular pay or a day off with regular pay. In making the determination, the Employer will take into consideration the employee's expressed preference.

11.5   Recognizing that the Employer works every day of the year and that it is not possible for all employees to be off on the same day, the Employer shall have the right, at its sole discretion, to require any employee to work on any of the holidays herein specified; however, the Employer agrees to distribute holidays off on an equitable basis. All full-time and regular part-time employees shall have at least every other holiday off, if so desired by the employee. All full-time and regular part-time employees shall work either the Christmas holiday or the New Year holiday. Employees' preference shall be considered regarding which holiday they wish to work.

11.6   If a holiday, as specified in Article 11.1, falls on an employee's regularly scheduled day off, the employee shall receive an additional days regular pay or a day off with regular pay within thirty (30) days of the holiday as mutually agreed by the employee and the department head.

11.7   In order to be eligible for the foregoing holidays and holiday pay benefits, a regular full-time employee must have worked the full last scheduled workday before and full first scheduled workday after the holiday, or the day selected in lieu of the holiday, except in the case of an illness of an employee, spouse, or child or accident preventing the employee from working as evidenced by written certification of a physician or other acceptable proof if requested by the Home. An employee who fails to report for work on the holiday when scheduled to do so shall not receive holiday pay for the unworked holiday.

11.8   Regular part-time employees who have completed their probationary period shall be entitled to holiday pay on a pro rata basis in accordance with Section 10.1.

11.9   Employees may take their holiday with or without pay within thirty (30) days before or after the holiday date provided they give fourteen (14) days' notice to the Employer.

The Employer shall inform employees no later than seven (7) days irrespective of weekends after appropriate notice has been given as to whether or not their holiday time has been approved.

If an employee wishes to be paid for holiday time, the employee must notify the business office at least fourteen (14) days prior to the holiday.

ARTICLE 12
VACATIONS

12.1   Eligible employees shall be entitled to accrued vacations each year with pay as follows:

(a)  One (1) year of service          two (2) weeks pay

(b)  Five (5) years of service        three (3) weeks pay

(c)  Ten (10) years of service        four (4) weeks pay

(d)  Twenty (20) years of service     five (5) weeks pay

12.2   Vacation schedules shall be established taking into account the wishes of the employees and the needs of the Employer. Where there is a conflict in choice of vacation time among employees, classification seniority shall prevail.

Employee vacation requests should be submitted to their supervisor by March 1 of each year, and those employees will be notified within two (2) weeks whether or not their request will be granted. After March 1, vacations shall be granted on a first come, first serve basis. All vacation requests after March 1 must be submitted at least thirty (30) days in advance of the desired vacation time and such requests will be responded to within two (2) weeks as to whether or not the request will be granted. Classification seniority prevails only on those requests submitted by the March 1 deadline. Employee requests for time off for dates before the March scheduling period shall be submitted at least thirty (30) days in advance of the desired vacation time and such requests will be responded to within two (2) weeks as to whether or not the request will be granted.

(a) Vacation requests for a one (1) day period of time shall be granted in accordance with Section 12.2 up to a maximum of five (5) days per year per employee. Vacation requests of more than one (1) day at a time shall be granted in accordance with Section 12.2. Vacation requests which include weekends shall be granted in accordance with Section 12.2, as long as such requests are for a period of at least five (5) calendar days.  Employees may request vacation for any days during the year.

24

12.3    An employee who has quit or who has lost his seniority pursuant to the terms of Article 7 (except those discharges involving moral turpitude) and who has not received or taken earned vacation shall receive vacation earned but not taken as of the last anniversary date of hire of the employee. After one (1) full year of continuous employment, pro rata vacations shall be granted to all employees who are laid off or who resign provided that employees who resign give at least two (2) weeks' notice in writing to the administrator.

12.4    An employee shall be paid his vacation pay before starting his vacation, provided the employee has given the administrator two (2) full weeks' notice in writing of the date of his vacation, in order to permit full compliance with all bookkeeping procedures.

12.5    Vacation pay shall be based upon the employee's regular rate of pay in effect on the first (1st) day of his scheduled vacation.

12.6    No part of an employee's scheduled vacation may be charged to sick leave. Vacations shall be taken each year and may not be accrued from year to year, and employees will not be compensated for vacation time not taken. Provided, however, that an employee who is unable to schedule vacation prior to her/his anniversary date, due to documented injury or illness, or due to the Employer's inability to schedule such vacation, shall be granted an equivalent amount of pay at the employee's straight time hourly rate in lieu of paid vacation time off. The Employer may require a timely request for such pay.

12.7    Absence due to established illness, maternity leave, or injury not exceeding five (5) weeks shall be counted as time worked in determining the amount of vacation pay for employees with more than one (1) and up to and including, but not exceeding, five (5) years of service. For employees with service beyond five (5) years, the period shall be thirteen (13) weeks.

(a) If such absence extends into an employee's scheduled vacation period, the vacation shall be postponed and another period assigned. If disability due to illness, maternity, or injury begins after an employee commences his vacation, the original vacation shall remain in effect.

(b) Absences due to reasons other than approved sick leave shall not count as time worked in computing vacation pay. Vacation pay for such employees shall be prorated by relating the number of weeks actually worked during the vacation eligibility year with the number of days or weeks such employee would have been contractually entitled to had he worked the entire vacation eligibility year.

(c) All voluntary absences shall not be deemed nor considered as time worked in the computation of vacation pay. Where an employee has been voluntarily absent, his vacation pay shall be prorated on a percentage basis, i.e., the period of time actually worked as that period relates to the period of vacation pay due him.

12.8   Regular part-time employees who are otherwise eligible for vacation pay shall have their vacation benefits prorated in accordance with Section 10.1.

12.9   Employees covered by this Agreement shall be entitled to their vacations only after these vacations are earned and accrued.

12.10   All employees covered by this Agreement, hired after August 3, 1978, shall be entitled to their vacations only after these vacations are earned and accrued. All employees hired prior to August 3, 1978, shall be permitted to continue the Employer's past practice with regard to summer vacations.

12.11   Vacation time may be used to cover an employee's absence due to nonwork related illness or injury if all available sick time benefits have been expended.

ARTICLE 13
<u>SICK LEAVE</u>

13.1   Sick leave is defined as an absence of an employee from work by reason of illness or nonwork connected accident and is not compensable under the Workers' Compensation laws of Pennsylvania.

13.2   Sick leave shall be earned by regular full-time employees at the rate of one (1) day per month of employment after the employee has completed his/her probationary period retroactive to date of hire. Sick leave shall be cumulative to forty-five (45) days.

13.3   Notification and Proof of Illness   To be eligible for benefits under this Article, an employee who is absent must notify the Employer ninety (90) minutes prior to the start of their regularly scheduled shift. The Employer may require written clarification of a physician or other proof of illness or injury hereunder for those employees absent three (3) or more consecutive days or when the Employer has reason to believe sick leave is being abused. Employees who have been on sick leave also may be required to be examined by the Employer's doctor or his designee, before being permitted to return to duty.

13.4   Employees may cash-in all sick days earned, but unused in the current year and up to 10 banked sick days.   The exchange will be one (1) full day pay for one (1) full sick day. Eligible employees who wish to exchange unused sick leave must notify the business office no later than November 15 of each year. Checks will be distributed by December 23.

13.5   Employees who have completed three (3) or more years of service who are under a doctor's continuing care for a serious medical condition, verified by the doctor's written certification, may be eligible to be given in advance sick leave which they would have earned for the balance of the year in which the medical condition occurs. The sick leave must be taken in three (3) day blocks until the advance entitlement is exhausted. No advance sick leave will be granted until all accumulated sick leave is exhausted.

13.6   On the Job Injury   If an employee is injured during the course of the workday and reports the injury to the Employer, the Employer agrees to pay the employee for time lost from work while receiving treatment in a clinic or in a hospital if required. If, on the orders of a physician, an employee is kept in the hospital or sent home, said employee shall be paid for the balance of the workday at his appropriate hourly rate of pay. An employee who is sent home from work by the Employer due to illness shall be paid for a full days work at his regular rate of pay but only to the extent that he has unused sick leave available.

13.7   The Employer shall furnish to the Union the names of its Workers' Compensation insurance carrier and the policy number upon execution of this Agreement.

27

ARTICLE 14
PAID LEAVE

14.1   Funeral Leave   Any employee who has completed his probationary period shall be entitled to a leave of absence with pay at his regular straight time hourly rate for a maximum of three (3) regular scheduled workdays lost in the case of death in his immediate family: namely, spouse, child, brother or sister, parent, step parent, step child and mother-in-law or father-in-law; provided, the leave of absence is taken during the period between the date of death and the day following burial, both inclusive, and provided further that the employee is prepared to offer valid proof of death and relationship to the deceased upon request.

(a) In the event of the death of a grandparent, grandchild, sister-in-law, or brother-in-law, aunt, or uncle any employee, if scheduled to work, shall be given one (1) day off with pay for the purpose of attending the funeral.

(b) Two (2) scheduled days off with pay will be granted if the employee travels one hundred and fifty (150) miles to attend the funeral. Three (3) scheduled days off with pay will be granted if the employee travels three hundred (300) miles to attend the funeral.

(c) As in the preceding Section 14.1, the Employer may require proof of death, proof of the relationship and proof of the distance actually traveled.

14.2   Jury Duty   A regular full-time or part-time employee who has completed his probationary period and who is called to serve on jury duty shall be compensated by the Employer for the difference between his regular straight time hourly pay for each regularly scheduled workday lost and the amount received as a juror's fee; provided the employee offers valid proof of such jury duty and proof of the amount received as juror's fee upon request of the Employer. Whenever an employee on jury duty is temporarily excused from such duty by the court on his scheduled workday, he shall advise his supervisor as promptly as possible and stand ready to report for work, if requested to do so by the Employer. The receipt of a subpoena or the notice to report for jury duty must be reported

28

immediately to the administrator, and the Employer may request that the employee be exempted from such jury duty if, in the opinion of the Employer, the employee's services are services which are essential to the Employer at the time of the proposed jury service.

## ARTICLE 15
## UNPAID LEAVE

15.1   Employees who have completed their probationary period shall be eligible for unpaid leave in accordance with the following:

(a) <u>Medical Leave of Absence</u>   Unpaid leaves of absence for medical conditions may be granted for a period of up to twelve (12) months and also in conjunction with the terms and conditions of the Family Medical Leave Act. Employees shall be permitted to work as long as their physician certifies in writing that continued performance of all assigned duties will not be hazardous to the employee. The Employer has the right to verify the need for any leave of absence. Prior to returning to work, the Employer may require that the employee be examined and given clearance to return to work by a physician.

(b) Employees are eligible for such unpaid medical leaves of absence after they have completed nine (9) months' seniority. Employees must notify the Employer at least fourteen (14) days in advance of their desire to return to work. Failure to return to work within the specified time limits will be considered to be a voluntary termination unless the employee has requested and received an extension of leave in writing from the administrator or designee for good and sufficient reasons. Requests for such extension will not be unreasonably denied.

15.2   <u>Military Leave</u>   Leaves of absence for the performance of duty with the U.S. Armed Forces or with a reserve component thereof shall be granted in accordance with applicable law.

15.3   <u>Union Business</u>   A leave of absence not to exceed one (1) year shall be granted to employees with one (1) or more years of bargaining unit seniority in order to accept a full-time position with the Union, provided such leaves will not interfere with the operation of the Employer.

29

15.4   <u>Other Leaves of Absence</u>   The employee's right to take a leave of absence without pay for other good reasons will not be unreasonably denied by the Employer. Such leaves are limited to a maximum of thirty (30) calendar days and provided that such leaves will not interfere with the operations of the Employer. Employees may request an additional thirty (30) calendar days for good and sufficient reasons. All requests for a leave of absence shall be in writing and must be submitted at least fourteen (14) calendar days in advance of the dates requested, absent an emergency excusable by the Employer. Upon completion of the leave of absence, the employee shall have the right to return to his previous job, at the same time and same place as before the leave, if he returns within a six (6) month period. Leaves of absence without pay shall not be unreasonably denied by the Employer.

15.5   Employees on unpaid leaves of absence, except for certified Workers' Compensation cases, do not accrue benefits during the period of the leave or during any extension(s) of the leave.

15.6   Coverage of the Employee Group Health Plan will be extended to employees on an unpaid leave of absence up to sixty (60) days.

ARTICLE 16
HEALTH AND WELFARE

16.1   (a) <u>Participation in Health and Welfare Fund</u>   Effective January 1, 1999, Employer shall make monthly contributions to the SEIU Healthcare PA Health and Welfare Plan (the "Health and Welfare Fund"). The Health and Welfare Fund is a multi-employer plan that is administered pursuant to a Declaration of Trust and Plan Document, and any amendments thereto (collectively referred to as the "Plan"), which provide for equal representation on the Fund's Board of Trustees by the Union and the Employers contributing to the Fund.

(b) <u>Definition of Covered Employees</u>   The Employer shall participate in the Health and Welfare Fund as a contributing Employer with respect to each "Covered Employee." The term "Covered Employee," for the purpose of this Article, shall mean each bargaining unit employee who, as of the first of a given calendar month to which a contribution relates, has completed the probationary period set forth in Article 6 of this Contract and who is also:

30

1. a full-time employee (i.e., an employee who regularly works at least thirty-two [32] hours per week); or

2. a regular part-time employee (i.e., an employee who regularly works at least 24 but less than thirty-two [32] hours per week); or

3. an irregular part-time employee (i.e., an employee who works at least sixteen [16] but less than twenty-four [24] hours per week); and

4. has in effect a valid election for coverage under the Health and Welfare Fund pursuant to Section 16.3 of this Article.

16.2   Benefit Coverages under the Health and Welfare Fund

(a) Base Coverages for Full-Time Employees   Each bargaining unit employee who, as of the first of a given calendar month, is a full-time employee shall be covered for the month, subject to the terms of the Plan, for the following types of Health and Welfare Fund coverages:

*PLAN B LIFE AND AD&D COMPONENT — EMPLOYEE ONLY

(b) Base Coverage for Regular Part-Time Employees   Each bargaining unit employee who, as of the first of a given calendar month is a regular part-time employee, shall be covered for the month, subject to the terms of the Plan, for the following types of Health and Welfare Fund coverages:

*PLAN B  LIFE AND AD&D COMPONENT — EMPLOYEE-ONLY

(c) Optional Coverages under Health and Welfare Fund that may be Elected by Full-Time and Regular Part-Time Employees   The Employer shall, in accordance with Section 16.4 of this Article, offer, under the Employer's Section 125 Cafeteria Plan, to full-time and regular part-time employees the option of electing any combination of the following Benefit Coverage Components under the Health and Welfare Fund:

*PLAN  B  MEDICALAND  PRESCRIPTION  COMPONENT  — EMPLOYEE ONLY COVERAGE

31

or

*PLAN B MEDICALAND PRESCRIPTION COMPONENT – EMPLOYEE AND SPOUSE COVERAGE

or

*PLAN B MEDICALAND PRESCRIPTION COMPONENT – EMPLOYEE AND CHILDREN COVERAGE

*PLAN B MEDICALAND PRESCRIPTION COMPONENT — FAMILY COVERAGE

and/or

* PLAN B DENTAL COMPONENT – EMPLOYEE ONLY COVERAGE

or

* PLAN B DENTAL COMPONENT — EMPLOYEE AND SPOUSE COVERAGE

or

* PLAN B DENTAL COMPONENT – EMPLOYEE AND CHILDREN COVERAGE

or

*PLAN B DENTAL COMPONENT-FAMILY COVERAGE

(d) <u>Optional Coverages under Health and Welfare Fund that may be Elected by Irregular Part-Time Employees</u>  The Employer shall, in accordance with Section 16.4 of this Article, offer, under the Employer's Section 125 Cafeteria Plan, to irregular part-time employees the option of electing any combination of the following Benefit Coverage Components under the Health and Welfare Fund:

*PLAN B MEDICALAND PRESCRIPTION COMPONENT — EMPLOYEE ONLY COVERAGE

or

*PLAN B MEDICALAND PRESCRIPTION COMPONENT – EMPLOYEE AND SPOUSE COVERAGE

or

*PLAN B MEDICALAND PRESCRIPTION COMPONENT – EMPLOYEE AND CHILDREN COVERAGE

or

*PLAN B MEDICALAND PRESCRIPTION COMPONENT — FAMILY COVERAGE

and/or

* PLAN B DENTAL COMPONENT – EMPLOYEE ONLY COVERAGE

or

* PLAN B DENTAL COMPONENT — EMPLOYEE AND SPOUSE COVERAGE

or

* PLAN B DENTAL COMPONENT – EMPLOYEE AND CHILDREN COVERAGE

or

*PLAN B DENTAL COMPONENT – FAMILY COVERAGE

and/or

*PLAN B LIFE AND AD&D COMPONENT — EMPLOYEE-ONLY COVERAGE

16.3   <u>Submission of Monthly Contributions and Reports by Employer</u>

(a)   <u>Contributions</u>   The Employer shall make monthly contributions to the Health and Welfare Fund, in accordance with the terms of the Plan, including the due date for submitting contributions, for each bargaining unit employee who, as of the first of the month to which the contribution relates, is a Covered Employee.

(b)   <u>Amount of Contribution</u>   For each Covered Employee, the Employer shall submit to the Health and Welfare Fund a monthly contribution (which includes any co-pay component for which the Employer is reimbursed by employee deductions as provided in Section 16.4 of this Article) that is equal to the total monthly rate that has been duly established by the Board of Trustees of the Health and Welfare Fund and is effective for the given month with respect to the total package of Benefit Coverage Components (including any elected optional coverages) that are applicable to that Covered Employee.

(c)   <u>Monthly Reports</u>   The Employer shall also submit to the Health and Welfare Fund, together with such contributions, monthly eligibility reports in a form as is approved by the Board of Trustees of the Health and Welfare Fund.

16.4   <u>Election of Optional Coverages under Employer's Cafeteria Plan</u>

(a)   <u>Optional Health and Welfare Fund Coverages to be Offered Under Cafeteria Plan</u>   The Employer shall offer to full-time, regular part-time employees and irregular part-time employees the option under the Employer's Cafeteria Plan, operated in accordance with federal law, including Section 125 of the Internal Revenue Code, as amended, to elect to participate with respect to any combination of the optional Benefit Coverage Components under the Health and Welfare Fund that are listed for such classifications of employees in Section 16.2 (c) and (d) of this Article, and to have their gross compensation under this Contract reduced in accordance with paragraph (b) of this section, in order to obtain such coverages.

(b) <u>Amount of Employee Co-Pay</u> In order to reimburse the Employer, the gross salary of any full-time, regular part-time employee or any irregular part-time employee who has in effect for the period a valid election under the said Cafeteria Plan to receive any optional Benefit Coverage Component(s) under the Health and Welfare Fund shall be reduced by an amount sufficient to equal the "Employee's Share" of the total contribution rate (hereinafter the "Total Rate") that the Employer is required to submit to the Health and Welfare Fund for the optional benefit coverage component(s) elected by the employee. The Employer shall, to the extent practicable and in accordance with law, evenly spread the amount of the employee's salary reduction so that it is constant from week to week.

The "Employee's Share" shall be the difference between the total rate and the "Employer's Share." The "Employer's Share" shall be calculated as follows:

1. <u>For All Optional Full-Time Employee Coverages</u>  The "Employer's Share" for any elected Coverages for Full-Time employees shall be Eighty percent (80%) of the Fund rate for the Medical and Prescription, and/or Dental Coverage component that has been elected. .

2. <u>For All Optional Regular Part-Time Employee Coverages</u>  The "Employer's Share" for elected Coverage for regular part-time employees shall be eighty percent (80%) of the Fund rate for the Medical and Prescription, and/or Dental Employee Only Coverage Component.  With respect to any elective upgrades in coverage to "Employee and Spouse Coverage" or "Employee and Children Coverage" or "Family Coverage" for the Plan B Medical, and Prescription Component or the Plan B Dental Component that are set forth in Section 16.2 (c) for regular part-time employees, the "Employer's Share" shall be equal to Eighty percent (80%) of the cost of the Employee Only Coverage Component.

3. <u>For Optional "Employee-Only Coverages" for Irregular Part-Time Employees</u> With respect to the optional Plan B Medical, and Prescription Component-Employee-Only Coverage, or the Plan B Dental Component-Employee-Only Coverage, or Plan B Life and

AD&D Employee-Only Component listed in Section 18.2 (d) for irregular part-time employees, the "Employer's Share" shall be equal to the Total Rate multiplied by a fraction, the numerator of which shall be the number of hours the irregular part-time employee regularly works per week, and the denominator of which shall be forty (40) (i.e., the regular hours per week of the employee divided by forty (40), times the Total Rate). For example, the Employer's Share for a hypothetical employee who regularly works twenty (20) hours per week and who has elected coverage with a Total Rate of one hundred dollars ($100) would be fifty dollars ($50) (twenty [20] hours per week divided by forty [40], times one hundred dollars [$100] Total Rate equals fifty dollars [$50] for the Employer's Share). The hypothetical Employee's Share would also be fifty dollars ($50) (one hundred dollars [$100] Total Rate minus fifty dollars [$50] Employer's Share equals fifty dollars [$50] Employee's Share). The Employer's Share shall not be greater than Eighty Percent (80%).

4. For Optional "Family Coverage" and "2-Person Coverage" Upgrades for Irregular Part-Time Employees   With respect to any elective upgrades in coverage to "Employee and Spouse Coverage" or "Employee and Children Coverage" or "Family Coverage" for the Plan B Medical, and Prescription Component or the Plan B Dental Component that are set forth in Section 16.2 (d) for irregular part-time employees, the "Employer's Share" shall be equal to the amount the Employer would contribute for Employee Only Coverage in 16.4 (b)3.

16.5   Employer Not Responsible for Plan Design/Benefit Administration/Benefits   The parties acknowledge and agree that the fiduciaries of the Health and Welfare Fund, and not the Employer, are responsible for establishing specific eligibility and benefit coverage terms, and for administering benefit claims. Neither this contract nor the Employer's contributing to the said multi-employer plan pursuant to this Contract creates any liability or obligation on the part of the Employer, as opposed to the Health and Welfare Fund, to any employee or dependent of any employee with respect to Plan design, the administration of the Plan, or the payment of benefit claims. It shall be the responsibility of the Board of Trustees of the Health and Welfare Fund to set, and from time to time adjust, contribution rates in accordance with the terms of the Plan.

16.6 The Employer agrees to distribute forms and to provide information on the aforementioned plans to each current and new employee.

16.7 The Employer agrees to offer all eligible employees the option to participate in the SEIU Healthcare PA Health & Welfare Fund following the successful completion of the probationary period and to distribute plan information and enrollment forms necessary for the timely enrollment of employees.

There shall be an open enrollment period annually during which time employees may elect to make changes in their medical, prescription, vision, and dental coverages, including not electing coverage. This shall be the only time changes can be made other than new employees enrolling or for the exceptions provided for in IRS regulations (for example, the birth of a new child, change in marital status, or loss of other health benefit coverage).

16.8 The Employer shall offer short term disability coverage to employees on the same terms as nonunion employees. The coverage shall be offered during the next open enrollment period. The employee shall be responsible for one hundred percent (100%) of the premium for the plan.

16.9 Vision insurance shall be made available to full-time and part-time employees in the same manner as offered to the Employer's non-union employees in comparable classifications in Pennsylvania facilities. The employee is responsible for 100% of the total monthly premium for Vision coverage.

## ARTICLE 17
## MANAGEMENT RIGHTS

17.1 All management functions and responsibilities which the Employer has not expressly modified or restricted by a specific provision of this Agreement are retained and vested exclusively in the Employer. More specifically, the Employer reserves the right to establish and administer policies and procedures related to patient care, research, training, operations, services and maintenance of the Home; to reprimand, suspend, discharge or otherwise discipline

employees for cause; to hire, promote, transfer, layoff and recall employees to work; to determine the number of employees and the duties to be performed; to maintain the efficiency of employees; to establish, expand, reduce, alter, combine, consolidate or abolish any job classification, department, operation or service; to control and regulate the use of facilities, supplies, equipment and other property of the Employer; to determine the number, location and operation of divisions, departments and all other units of the Home, the assignment of work, the qualifications required and the size and composition of the work force; to make or change Employer rules, regulations, policies and practices not inconsistent with the terms of this Agreement; and otherwise generally to manage the Home, attain and maintain full operating efficiency and optimum patient care and direct the work force, except as expressly modified or restricted by a specific provision of this Agreement.

## ARTICLE 18
## DISCIPLINE AND DISCHARGE

18.1   The Employer shall have the right to discharge, suspend or discipline any employee for good and reasonable cause.

18.2   The Employer will notify the Union in writing of a discharge or suspension within seventy-two (72) hours from the time of discharge or suspension. Failure to notify the Union within seventy-two (72) hours shall require the discipline be dropped unless otherwise required by State or Federal law. If the Union desires to contest the discharge or suspension, it shall give written notice thereof to the Employer within five (5) working days but not later than ten (10) working days from the date of receipt of notice of discharge or suspension. In such event, the dispute shall be submitted and determined under the grievance and arbitration procedure hereinafter set forth; however, commencing at Step 3 of the grievance machinery. If the notice of contest is given from six (6) to ten (10) working days after receipt of notice of discharge, the days beyond five (5) days shall be deemed waived insofar as back pay is concerned.

18.3    The Employer shall have the right to adopt reasonable rules, policies and regulations which shall become effective after they are posted and shall have the right to impose discipline for violation thereof, including the right of suspension or discharge. Copies of new work rules, policies or changes in existing work rules shall be sent to the Union and posted at least one (1) full workweek (Monday – Friday) prior to implementation.

18.4    Employees shall be able to review their personnel files, upon written request, at a time mutually convenient and during normal business hours.  Employees shall not be paid for the time spent in the review. The review shall be in accordance with the parameters specified in PA Public Act 286. An Employer representative must be present during the file review. All disciplinary records will be disregarded one (1) year after the disciplinary action was taken unless the employee repeats a similar violation within one year.

18.5    In the event an employee is subjected to discipline or discharge, he or she shall have the right to demand the presence of a Union delegate to be present during any disciplinary action by the Employer.

18.6    All time limits herein specified shall be deemed exclusive of Saturdays, Sundays and holidays.

18.7    The Employer agrees to apply disciplinary measures in a timely manner. The Employer shall make every reasonable effort to complete disciplinary investigations where the employee has been suspended within seven (7) working days and shall issue a decision within five (5) working days after the completion of the investigation.

18.8    The progressive disciplinary procedure shall be as follows with the penalties in order of severity:

(a) First Warning   An initial warning outlining the improper conduct, its consequence(s), and a warning against repeated violations. A copy of this warning is recorded in the personnel file.

(b) Second Warning   More serious than the first warning, this penalty is also recorded in the personnel file.

(c) <u>Final Warning</u>  The final warning against work rule violations which does not impose financial loss on an employee. This is documented in the employee personnel file.

(d) <u>Suspension Without Pay</u>  This severe penalty can last up to five (5) scheduled workdays. It is the last step before discharge and is recorded in the personnel file.

(e) <u>Discharge from Employment</u>  This is the last step, and the employee's employment is terminated.

Any one (1) or more of these steps and penalties may be bypassed depending on the severity of the infraction.

ARTICLE 19
<u>GRIEVANCE PROCEDURE</u>

19.1  A grievance is defined as a dispute or complaint arising between the parties hereto under or out of this Agreement or the interpretation, application, performance, termination, or any alleged breach thereof, and shall be processed and disposed of in the following manner:

**STEP 1**   Within seven (7) working days, except as provided in Article 18, an employee having a grievance and/or his Union delegate or other representative shall take it up with his immediate supervisor. The Employer shall give its answer to the employee and/or Union delegate or other representative within seven (7) working days after the presentation of the grievance in Step 1.

**STEP 2**   If the grievance is not settled in Step 1, the grievance may, within seven (7) working days after the answer in Step 1, be presented to Step 2. When grievances are presented in Step 2, they shall be reduced to writing, signed by the grievant and his Union representative, and presented to the employee's department head. A grievance so presented in Step 2 shall be answered by the Employer in writing seven (7) working days after its presentation.

**STEP 3**   If the grievance is not settled in Step 2, the grievance may, within seven (7) working days after the answer in Step 2, be presented in Step 3. A grievance shall be presented in this Step to the administrator or his designee; and he or his designee shall render a decision in writing within seven (7) working days after the presentation of the grievance in this Step.

19.2   Anything to the contrary herein, notwithstanding a grievance concerning a discharge or suspension, may be presented initially at Step 3 in the first instance, within the time limit specified above.

19.3   A grievance which affects a substantial number or class of employees, and which the Employer representative designated in Steps 1 and 2 lacks authority to settle, may initially be presented at Step 3 by the Union representative.

19.4   All time limits herein specified shall be deemed to be exclusive of Saturdays, Sundays and holidays.

19.5   Without waiving its statutory rights, a grievance on behalf of the Employer may be presented initially at Step 3 by notice in writing addressed to the Union at its offices.

19.6   Failure on the part of the Employer to answer a grievance at any Step shall not be deemed acquiescence thereto, and the Union may proceed to the next Step.

19.7   The Employer shall provide copies of all responses to Step 3 grievances to the Union and to the delegate handling said grievance.

ARTICLE 20
ARBITRATION

20.1   A grievance which has not been resolved may, within ten (10) working days after completion of Step 3 of the grievance procedure, be referred to arbitration by the Employer or the Union to an arbitrator selected in accordance with the procedures of the American Arbitration Association (AAA). The arbitration shall be conducted under the Voluntary Labor Arbitration Rules then prevailing of the AAA. The moving party shall notify the other party within ten (10)

41

working days following receipt of the other party's response to a Step 3 grievance of its intent to submit said grievance to arbitration. The Demand for Arbitration must be filed within ten (10) days of the Employer's receipt of the letter of intent.

20.2   The award of an arbitrator hereunder shall be final, conclusive and binding upon the Employer, the Union and the employees.

20.3   The fees and expenses of the AAA and the arbitrator shall be borne equally by the parties.

20.4   The Arbitrator shall have jurisdiction only over disputes arising out of grievances, as defined in Section 19.1, and he shall have no power to add to, subtract from or modify in any way any of the terms of this Agreement.

ARTICLE 21
STAFFING

21.1   It is the duty of the Employer to staff the facility and schedule the staff including replacements of call ins. It is the Employer's responsibility to provide the number of professional staff and auxiliary personnel on all shifts that will be consistent with sound resident care to provide safe and adequate care. The Union shall provide employee input about resident care, and said input shall receive full consideration based upon its merit.

The staffing schedule will be posted on each floor of the facility. The Union and Employer agree to the mutual goal of rendering superior care to all residents at all times. To accomplish this goal, the Employer agrees to put forth its best efforts to ensure adequate care and adequate staffing in the facility per state requirements.

At such times as the state survey is being conducted, employees will be afforded the opportunity to present their views to the survey team.

It is understood that the ultimate responsibility in this area of resident care and staffing levels must be exercised by the Employer under current laws and regulations.

42

21.2   The Employer will establish/implement a Quality Care Program whose purpose shall be to ensure, maintain, and continuously improve the quality of life for residents. The program will include Focus Groups that are established to discuss quality care for residents.

Such Focus Groups will meet at least monthly and shall include three (3) bargaining unit employees, one (1) from each shift. In addition, a Patient Care Representative, designated by the Union, who shall be one of these employees, shall become an ad hoc member of the Quality Council (or other similarly structured group.) This employee shall attend relevant meetings of this Group and shall have input on the issues relevant to the Group, and may make recommendations to resolve and improve problems or concerns.

This employee shall attend such meetings with no loss in wages for participation with this Group, if such meetings are held during scheduled work time. If given at least fourteen (14) days advance notice, the Employer will adjust this employee's work schedule to permit them to attend no more than four (4) outside training sessions on non-work and unpaid time.

## ARTICLE 22
## EFFECT OF LEGISLATION – SEPARABILITY

22.1   It is understood and agreed that all agreements herein are subject to all applicable laws now or hereafter in effect; and to the lawful regulations, rulings, and orders of regulatory commissions or agencies having jurisdiction. If any provision of this Agreement is in contravention of the laws or regulations of the United States or of the Commonwealth of Pennsylvania, such provision shall be superseded by the appropriate provision of such law or regulation, so long as same is in force and effect, but all other provisions of this Agreement shall continue in full force and effect.

ARTICLE 23
HEALTH AND SAFETY

23.1   The Employer agrees to provide a safe and healthful work environment for employees and to maintain high standards of workplace sanitation, ventilation, cleanliness, light and noise levels, adequate heating and cooling and health and safety in general. The Union acknowledges its responsibility to promote health and safety and will cooperate with the employer in striving to maintain high standards. No worker shall be required to work under seriously hazardous (imminent danger) conditions. No worker shall be discriminated against for exercising the right to a safe and healthy work environment.

23.2   The Employer agrees to maintain a program of infectious and communicable disease control, and employees are expected to cooperate with this program and follow proper patient care procedures. The Employer agrees to advise employees when there is exposure to infectious disease and direct employees in the appropriate patient care procedures.

23.3   List of products/chemicals used at the work site will be prepared and will be available to the employees for reference. Material Safety Data Sheets (MSDS) will also be available to employees upon request for all products which have such information.

23.4   There shall be a joint labor-management health and safety committee with equal numbers of management and Union members designated by the Employer and the Union. The chair shall be taken by the Union and the Employer for alternate six (6) month periods. The purpose of the committee shall be to identify and investigate health and safety hazards and preventive measures. Additionally, the committee will monitor all ongoing health and safety programs to assure their effectiveness in preventing hazardous working conditions. Investigation and monitoring shall be understood to include necessary work site inspections. The committee shall have the authority to make recommendations to correct health and safety hazards.

The committee shall meet at least monthly and at other times upon reasonable request of either side. Each party will submit to the chair for the meeting an agenda of topics to be discussed at least seven (7) days prior to the regularly scheduled meeting. Committee members shall be given leave with pay to attend meetings and conduct approved committee business. The Employer shall provide to the committee, on a monthly basis, data containing vital information on all work related injuries and illnesses.

Accurate minutes of the meetings shall be maintained, reflecting comments by both management and Union members. The minutes shall be signed by a Union and Employer representative certifying completeness and accuracy.

23.5   It shall be the policy of the Employer to maintain staffing consistent with quality patient care and worker safety. Staffing ratios and acuity shall take worker and resident safety into account. The Employer agrees to complete a census of all residents to determine special lifting considerations. Management shall maintain staffing levels that provide reasonable work loads based on staffing levels set by state law. In the event call offs reduce staffing, management will make its best efforts to replace call offs. The Employer will not count, not to exceed one (1) employee at a time, an employee on transitional duty in calculating staffing.

23.6   The current practice, or other procedures allowed by state law, with regard to choice of physicians for treatment of work-related injuries shall be utilized. The Employer will take reasonable steps to provide transitional work and return to work programs for workers injured on the job to the extent work is available. The work will be specific, tailored to the limitations of each injured worker, and approved by a physician selected by the Employer. Injured workers shall be reevaluated by management within two (2) workdays of returning to work to determine if the assigned workload is consistent with the employee's limitations. As necessary, the employee will be referred to the Employer's physician for reevaluation.

23.7   Engineering controls shall be the method of choice in reducing cumulative trauma. Appropriate equipment will be made available for employee use. The Health and Safety Committee shall identify,

recommend and test engineering controls such as patient handling devices to be purchased by the Employer. Training on each new piece of equipment shall be provided before the equipment is used by the employees.

23.8   It is the Employer's intention to comply with federal and state law at all times. Nothing in this Article is to be construed as imposing greater or lesser obligations, standards or duties on the Employer.

23.9   Infectious Diseases   The Employer agrees to keep employees informed of any infectious diseases that may be present in the facility and will take all reasonable steps to protect residents and employees from infectious diseases.

23.10   Light/Limited Duty   It is understood that light or limited duty is limited to cases of job-related injury, illness and rehabilitation.

## ARTICLE 24
## SUCCESSORSHIP AND JOB SECURITY

24.1   In the event the Employer determines that it is necessary to subcontract work which is performed by bargaining unit employees covered by this Agreement, the Employer shall require as a condition of any agreement with such subcontractor: (a) that the subcontractor will offer such work to bargaining unit employees who would be affected; (b) the subcontractor will recognize the Union and; (c) the subcontractor agrees to be bound by the terms of the current Collective Bargaining Agreement.

24.2   Bargaining Unit Work   Nonbargaining unit employees shall not do work normally performed by bargaining unit employees, except for the purpose of instruction, training, supervision, filling in for absenteeism after the call list is used, emergencies, or where the normal duties of nonbargaining unit employees overlap the duties of employees. An emergency is herein defined as any suddenly arising situation necessitating immediate action by the supervisor to maintain safety or health, to prevent damage to equipment, facilities, property, and/or materials, and to aid in correcting or repairing malfunctions.

24.3   The Employer will provide job training necessary for current employees to maintain their current positions when job requirements are changed. In the event of layoff, the Employer shall offer training to no more than five (5) employees, those whom would be laid off, at one time to fill available bargaining unit positions, if such training lasts less than two (2) weeks. In the event more than five (5) employees are laid off, training shall be offered on the basis of seniority.

24.4   <u>Notice of Sale:</u>   In the event of any sale, purchase, merger or other transaction affecting ownership of Employer's nursing home business or ownership of the assets of Employer's nursing home business, Employer shall make known to the Union sixty (60) calendar days prior to said transaction the nature of the transaction and further, shall make known to all parties to the transaction the terms and conditions of this Agreement.

The Employer shall agree to meet with the Union upon request to discuss the sale and to bargain over the effects of such action on employees.

## ARTICLE 25
## LABOR-MANAGEMENT COMMITTEE

25.1   <u>Labor-Management Meetings</u>   The parties to this Agreement shall be entitled to request labor-management meetings on a monthly basis. Said meetings shall be convened at the request of either party. Attendance at these meetings shall be limited to three (3) people from both management and the Union and the Union representative.

Additionally, LPNs or the Employer shall be entitled to request labor-management meetings on a monthly basis. Said meetings shall be convened at the request of either party. Attendance at these meetings shall be limited to three (3) representatives of the Employer, and three (3) LPNs and the Union representative.

25.2   Delegates shall be paid for time spent in labor-management meetings.

ARTICLE 26
NO STRIKE OR LOCKOUT

26.1   No employee shall engage in any strike, sitdown, sit-in, slowdown, cessation or stoppage or interruption of work, boycott, sympathy strike or other interference with the operations of the Employer.

26.2   The Employer will not lock out employees during the term of this Agreement.

ARTICLE 27
MISCELLANEOUS

27.1   The Employer agrees to meet, upon written request, to hear the Union's concerns, suggestions, proposals, etc. regarding any training programs for the purpose of preparing employees to complete a State Nurse Aide Certification.

Employees covered by this Agreement, who are employed in non-nursing departments who desire to become a nurses aide, may submit a written request to the Company and will be given first consideration when such nurses aide training is offered, subject to availability of adequate replacements for their former positions.

A nurses aide on the payroll as of the ratification date of this Agreement who fails to obtain any required state certification shall be given preference for hire for any nonnursing bargaining unit positions the Employer chooses to fill and for which they are qualified for a period of one (1) year.

Employees who are required by the Employer to attend training programs shall be paid for all hours in training.

27.2   The Employer will make available to all employees the current Corporate Educational Assistance Program. The continuation of this program shall be at the discretion of the Employer.

27.3   Uniform Allowance   Full time employees who regularly work four (4) full days per week or more shall be given a uniform allowance of ninety dollars ($90) per year, to be paid at the completion of each

full year of employment (employee's anniversary date). To be eligible for the full uniform allowance, the employee must have worked full time for six (6) months of the previous twelve (12) months. Part-time employees will receive a prorated allowance based on all hours worked in the last year.

27.4   Each new employee shall receive an initial orientation/training program. All such training will meet the standards required by law and regulation.

27.5   Resident Relations/Abuse   The Employer and the Union agree to the formation of a joint committee to seek the elimination of abuse and to deal with problems of resident/staff conflict. The Union shall provide employee input about resident abuse and resident/staff conflict, and said input shall receive full consideration based upon its merit. It is understood that the ultimate responsibility in this area of abuse must be exercised by the Employer under current laws and regulations.

27.6   Employees shall be required to maintain their current address on file in the Business Office. All notices to employees will be considered as to have been properly sent if they are sent to the last address of record.

27.7   All provisions of this Agreement shall apply to the cook bargaining unit. Cooks currently employed shall not lose any accrued benefits acquired before inclusion under the Contract.

27.8   For purposes of this Agreement, a day is defined to mean any day of the week, Sunday through Saturday including holidays. A workday for purposes of this Agreement is defined to mean any day, Monday through Friday excluding holidays.

27.9   LPNs employed prior to January 3, 1989, shall not lose any accrued benefits not yet used, as the result of these negotiations.

27.10   All references to the Union as regards the Employer's obligation to provide notice to the Union shall require that such notice be mailed to the Union at its offices.

27.11   The following are past practices which shall continue as heretofore:

(a) <u>Employee Discount</u>   Specified relatives of employees are eligible for a ten percent (10%) discount on the cost of room and board rate when patients in the Employer's facility. No ancillary charges other than room and board are included. Relatives for whom the discount would apply after the employee completes his or her probationary period are parents, children, spouse, mother-in-law, father-in-law, grandparents and grandparents-in-law. To maintain the discount, the patient's account must be current within thirty (30) days.

(b) <u>Christmas Bonus</u>   The five dollar ($5) and ten dollar ($10) Christmas bonus shall continue as in the past.

27.12   It being the desire of the parties to provide for an orderly system of recruitment and placement of workers on jobs in the Institution, it is therefore agreed:

(a) The Employer shall utilize the Union for assistance in the recruitment and referral of qualified personnel for bargaining unit job vacancies and training positions.

(b) The Employer shall notify the Union of all bargaining unit job and training position vacancies and shall afford the Union three (3) days from the time of notification to refer an applicant for the vacancy before hiring from any other source.

(c) Notwithstanding the foregoing, the Employer retains the right to hire such applicants referred by the Union as it deems qualified in its sole discretion; the Employer also retains the right to hire applicants from other sources in the event the Union does not refer qualified applicants within such three (3) day period. It is agreed that the costs, if any, of obtaining such qualified applicants through an employment agency shall be paid by the Employer.

(d) The Employer shall not be required to notify the Union of any job vacancy which must be filled without delay in order to meet an emergency or to safeguard the health, safety or well being of patients.

27.13   The LPNs may elect on an annual basis one (1) of three (3) options:

(a)  Selective benefit program participation.

(b)  No frills hourly rate participation.

(c)  Contractual benefits participation.

## ARTICLE 28
## TRAINING AND EDUCATION FUND

28.1  Effective Upon ratification and for the duration of this Collective Bargaining Agreement including any renewals and extensions thereof, the Employer agrees to contribute one percent (1%) of the gross payroll for bargaining unit employees each month to the SEIU Healthcare PA Training & Education Fund and become a participating Employer for Beaver Valley Nursing Center.   If the parties are not able to reach mutual agreement on educational and training programming and goals, then contributions shall cease and the Employer shall begin contributing for the next facility.  Each Additional facility shall join the Training and Education Fund and begin making contributions when the parties agree to the programming and set participation goals.  If the facility is not able to meet the participation goals by the agreed upon timeframe, then contributions for that facility shall cease.  At the request of either party, the Union and Employer will meet to discuss the programming and goals and they can be adjusted or changed by mutual agreement.

The Employees and Employer will meet and establish a training and education program that meets the needs of the employees at the facility and set a participation goal by mutual agreement.  When that initial goal is met for Beaver Valley, Spruce Manor shall join the Fund, then Broad Mountain, then Slate Belt as the previous facility meets their mutually agreed upon participation goals.  It is the intent of the parties to set and meet goals for all 4 facilities during the term of this Agreement.

If a facility cannot reach mutually agreeable programs and goals, the sequence of facilities to participate will changed.

28.2 Subject to Section 28.1 above, the Employer agrees to contribute one percent (1%) of the gross payroll for bargaining unit employees. Contributions so received shall be used to design, develop, implement, and evaluate training and education programs as the Trustees of the Training Fund may from time to time determine.

## ARTICLE 29
## DRUG AND ALCOHOL SUBSTANCE ABUSE POLICY

29.1   It is the policy of the Employer to operate and maintain its facilities in a safe and efficient manner and to provide a safe work environment for its employees as well as its clients. Consistent with the spirit and the intent of this policy, the Facility prohibits the possession, ingestion, use, distribution, sale and being under the influence of controlled substances and/or alcohol on the Employer's premises. Open alcohol containers, drug paraphernalia and/or contraband are also prohibited on the Employer's premises (premises include all Facility property, facilities, buildings, storage areas, parking areas, vehicles, etc.) Additionally, it is the policy of Employer to provide our employees with opportunities for rehabilitative assistance, when required, so that they may retain their employment relationship.

## PURPOSE

29.2 The purpose of this Drug and Alcohol Abuse Assistance program, here and after "Program" is to set forth policies and the procedures concerning employee possession or use of Alcohol and Controlled Substances or Drugs, as defined herein.

## SCOPE

29.3   This program shall apply to all employees.

29.4 This policy and program prohibits the possession, ingestion, use trafficking and being under the effects of drugs or any other

substance which affects the senses on the Employer's premises (premises include all Facility property, facilities, buildings, storage areas, parking areas, vehicles, etc.).

29.5 This policy and program outlines the procedures to be implemented regarding the reporting, testing, rehabilitation and restoration of active employment necessary to ensure compliance with our policy of operating in a totally safe, healthful and productive environment.

<u>DEFINITIONS</u>

29.6 Controlled Substances — Any drug or substance listed in Controlled Substance Drug Device and Cosmetic Act 64, including but not limited to:

| | |
|---|---|
| Cannabis | (Marijuana, Hashish, Hashish Oil, Etc.) |
| Stimulants | (Amphetamines, cocaine, crack, etc.) |
| Depressants | (Barbiturates, Quaaludes, Valium, etc.) |
| Narcotics | (Morphine, heroine, opium, Dilaudid, etc.) |
| Hallucinogens | (LSD, PCP, mescaline, peyote, "designer drugs," etc.) |

29.7 Legal Drug — A prescribed or over-the-counter drug which has been legally obtained and is being used for the purpose for which it was prescribed or manufactured.

29.8 Illegal Drug — Any drug which cannot be legally obtained (i.e. marijuana, cocaine, crack, etc.) or which, although legal has been illegally obtained, or prescribed, drugs not being used for the prescribed purposes, or in larger doses than recommended.

29.9 Alcohol — Any alcoholic beverage, the consumption of which affects the performance and actions of an employee to the extent that he/she may pose a threat to the safety of himself/herself or his/her coworkers.

29.10    Medical Authorization – A prescription or other writing from a licensed physician or dentist for the use of a Drug in the course of medical treatment, including the use of methadone in certified drug program.

TESTING

29.11    All employees will continue to be subject to a drug and alcohol screening as part of a pre-employment physical.

29.12    Employees of Employer shall submit to drug testing on the basis of the following circumstances.

a.    Where there is aberrant or unusual on-the-job behavior of an individual employee which (1) is observed by the employee's immediate supervisor or higher ranking employee and confirmed by the observation of another supervisory employee who recognizes the symptoms of drug abuse, impairment, or intoxication (all such observations shall be documented in writing by the observers); (2) is the type of behavior which is recognized and accepted symptom of intoxication or impairment caused by illegal drugs or alcohol; and (3) is not reasonably explained as resulting from other causes other than the use of controlled substances; or (4) where observation of the use of a controlled substance (drug or alcohol) has occurred.   There shall be no random or blanket testing.

29.13    All employees are encouraged to report any unusual behavior that may present an unsafe condition, to their immediate supervisor who will in turn evaluate the need for testing in accordance with 29.12 above.  The Facility agrees to provide training to the hourly employees at Facility expense, with no loss in pay to help employees recognize drug and alcohol problems.

29.14    Refusal to take such tests as provided above may result in disciplinary action up to and including discharge.

29.15    An employee required to submit to alcohol and/or drug testing shall be informed of the reason for such testing and offered the opportunity to obtain union representation.   In the case of "reasonable suspicion" testing, the supervisor will give the employee and his/her union representative a written list of the suspicious behavior.

## TESTING PROCEDURES

29.16    Type of Test:  Testing may include urinalysis for drug testing, breathalyzer test, blood test or other approved drug/alcohol test/screen procedure.  Drug testing will be collected and screened in accordance with mandatory guidelines for Federal Workplace Testing Programs, 53 Federal Register, 11970.  All testing under this policy will be done at a United States Department of Transportation accredited / certified drug and alcohol testing facility.

29.17    All specimens will be initially tested (screened) for the following drugs or their metabolites at cut-off levels not greater than those specified below:

| Drug / Metabolite | Maximum acceptable cut-off In Nanograms / Milliliters |
|---|---|
| Marijuana metabolites | 50 |
| Cocaine metabolites | 300 |
| Opiate metabolites | 300 |
| Phencyclidine (PCP) | 25 |
| Amphetamines | 1000 |
| Methaqualone | 300 |
| Methadone | 300 |
| Benzodiazepines | 350 |
| Barbiturates | 200 |
| Propoxphene | 300 |
| MDMA-Ecstasy | 300 |

Initial tests (screens) will be considered negative if immunoassay tests performed at cut-off levels equal to or less than those specified above yield a negative result.  If initial tests which are positive are confirmed by GC/MS, the results will be considered negative if they cannot be confirmed by GC/MS using cut-off levels not greater than those specified below:

| Drug / Metabolite | Maximum acceptable cut-off In Nanograms / Milliliters |
|---|---|
| Marijuana metabolites | 15 |
| Cocaine metabolites | 150 |
| Opiate metabolites | 300 |
| Phencyclidine (PCP) | 25 |
| Amphetamines | 500 |
| Methaqualone | 300 |
| Methadone | 300 |
| Benzodiazepines | 300 |
| Barbiturates | 200 |
| Propoxphene | 300 |
| MDMA-Ecstasy | 300 |

29.18    A test result determined to be positive under the criteria may be regarded as negative if the drug or metabolite detected results solely from the individual's consumption of prescribed or over the counter medication in accordance with a physician's instructions. The provisions of Section 29.12 and 29.13 shall apply to any employee taking prescribed medication.

29.19    Testing for alcohol whether measured by a breathalyzer or by blood alcohol tests will be considered positive if the blood alcohol level measures .08 or greater.

29.20    Results of all drug and alcohol tests shall be communicated to the employee and his/her Union representative as soon as possible upon receipt of the results from the testing facility.  Copies of all documents, including test results, computer printouts, graphs, interpretations, chain of custody forms, and observation statements, shall be given to the donor and his/her Union representative upon request.

29.21    All body fluid collections for testing purposes shall be conducted by a physician or health care professional.  Specimen containers shall be labeled with a number and the donor's signature and shall be closed with a tamper proof seal in the donor's and Union representative's presence.

29.22    The specimen number and identifying information shall be entered on a log and signed by the collecting technician in the presence of the donor and the Union representative, and the donor shall initial the proper line on the log entry.

29.23    The volume of each specimen shall be sufficient to permit for confirmation testing and/or independent testing (at the cost of the donor)

29.24    The testing facility must retain and store, for up to thirty (30) days, in a scientifically accepted manner designed to maintain the integrity of all specimens, a portion of each specimen so that independent testing can occur if so requested.

29.25    All handlers and couriers of the specimen must complete entries and identify themselves n a proper chain of custody form.

29.26    All records and information obtained by the Employer and the Union concerning observations, testing, and treatment will be confidentially maintained by the both the Employer and the Union.

COUNSELING

29.27    The Employer will consider offering counseling/rehabilitation to an employee who test positive based on the employee's circumstances.

29.28    Any employee voluntarily reporting his/her abuse of Controlled Substances, Drugs or Alcohol may be temporarily placed on an unpaid leave of absence for participation in an in-patient rehabilitation program.

29.29    Employees, who are referred to counseling, where counselor recommends, will be placed on leave to complete the appropriate rehabilitation.  The leave shall be paid or unpaid depending upon the availability of accrued benefit time.

29.30    When an employee is referred to counseling and counseling reports that the employee has not met the requirements of the Drug and Alcohol Program, the employee may be subject to discipline up to and including discharge.

29.31   The counselors shall notify the Safety Coordinator immediately in all cases where an employee has failed to cooperate or satisfactorily meet the requirements of the rehabilitation program prescribed.   Such notification shall be in writing and copied to the Union.   The counselors shall update the Safety Coordinator of the condition of all employees receiving treatment.

## RESTORATION TO ACTIVE SERVICE

29.32   An employee who has been provided a paid leave of absence to undergo counseling and subsequent treatment will be restored to active duty if he or she is certified by such program or other medical authority as being free from use of alcohol, drugs, or controlled substance as defined in this policy and procedure.

29.33   As part of its obligations under the Drug-Free Workplace Act of 1988, the Company must notify the federal government, within certain strict time limits, whenever any of its employees have been convicted of drug-related crimes for violations occurring in the workplace.   Employees therefore must report any drug-related convictions immediately to management for appropriate action.

ARTICLE 30
DURATION

30.1   This Agreement shall become effective upon ratification and shall continue in full force and effect through March 31, 2016. The Employer and the Union agree to jointly enter into discussions relative to a renewal of this Agreement no later than the ninetieth (90th) day immediately preceding the termination date of this Agreement.

IN WITNESS WHEREOF, the parties hereby have set their hands.

SEIU Healthcare Pennsylvania
CTW, CLC

Northern Health Facilities, Inc.
d/b/a Spruce Manor Nursing and
Rehabilitation Center

_____
For the Union

_____
For the Employer

_____
Date

_____
Date

59

## APPENDIX A
## DUES CHECK-OFF AUTHORIZATION CARD/
## <u>SOLIDARITY-POLITICAL ACTION CARD</u>
# SEIU HEALTHCARE PENNSYLVANIA, CTW, CLC
## <u>APPLICATION FOR MEMBERSHIP</u>
*(Please Print)*

Name _____

Address_____City/State _____Zip _____

Home Phone (_____) _____Cell Phone (_____)_____

E-Mail Address _____ Social Security # _____

Work Location (Facility or District) _____

Job Title _____Dept./Floor _____Probation Ended_____

Hourly Wage _____Full or Part Time _____ Date Hired_____

I hereby accept membership into Service Employees International Union Healthcare PA, at its principal office as designated by the Union, and designate said Union to act for me as collective bargaining agent in all matters pertaining to conditions of employment. I hereby pledge to abide by the Constitution and By-Laws of Service Employees International Union Healthcare PA.

Signed _____ Today's Date_____

## CHECK-OFF AUTHORIZATION

To Employer:_____

You are hereby authorized and directed to deduct initiation fees, assessments or any other fee as required by the By-laws and Constitution of the Union, as a condition of membership and in addition thereto, to deduct each month my monthly membership dues or, where applicable, representation or agency fees, in an amount certified by the Union; and to remit all such deductions to Service Employees International Union Healthcare PA, at its principal office as designated by the Union, no later than the tenth (10th) day of each month immediately following the date of deduction. This authorization may be revoked on any anniversary date of this authorization or on the expiration date of any collective bargaining agreement between the employer and the union, by written notice to the employer and the union not more than fifteen (15) days or less than ten (10) days prior to such anniversary date or such expiration date.

Name _____ Soc. Sec. #_____

Address _____

City_____ State _____ Zip _____

Work Location (Facility or District) _____

Agency (State Unit Only) _____

Job Title_____ Dept./Floor _____

Signature_____ Date_____

60

## Help Working Families Gain a Stronger Voice
## Contribute to SEIU's Committee on Political Education (COPE)

**Yes! I will do my part to make elected officials listen to health care workers. Sign me up for a voluntary contribution to SEIU COPE.**

I authorize my local union to file this payroll deduction with my employer and for my employer to deduct _____ $7.00; or _____ $5.00; bi-weekly; and transfer the funds to the SEIU Healthcare PA Solidarity-Political Action Fund as a voluntary contribution to SEIU COPE.

I understand that: 1) I am not required to sign this form or make COPE contributions as a condition of my employment by my employer or membership in the union; 2) I may refuse to contribute without any reprisal; 3) Only union members and executive/administrative staff who are U.S. citizens or lawful permanent residents are eligible to contribute to SEIU COPE; 4) The amounts on this form are merely a suggestion, and I may contribute more or less by this or some other means without fear of favor or disadvantage from the union or my employer; 5) SEIU COPE uses the money it receives for political purposes, including but not limited to addressing political issues of public importance and contributing to and spending money in connection with federal, state and local elections.

Contributions to SEIU COPE are not deductible for federal income tax purposes. This authorization shall remain in effect until revoked in writing by me.

*My signature below shows that I have reviewed and agree with the terms above.*

Signature _____ Date_____

Name _____

Home Address_____

Home Phone _____ Home Email _____

Cell Phone_____ Birth Date_____

Occupation _____ Employer _____

61

## LETTER OF AGREEMENT

This Letter of Agreement is made and entered into by and between Unicare Health Facilities, Inc., d/b/a Spruce Manor Nursing and Rehabilitation Center and SEIU Healthcare Pennsylvania, CTW, CLC.

<u>Absentee Control Program</u>

Employee absenteeism negatively affects the ability of the nursing facility to provide high-quality care to residents on a consistent basis. While absenteeism has many causes, it creates additional burdens for employee who do report to work, and increases the potential for hazardous situations in a facility with large numbers of ill or infirm residents

Absenteeism includes not only absence from work, but late reporting for a scheduled shift, unauthorized extension of a meal or rest break period, leaving early or improper use of other employer-paid time. Corrective measures utilized by this program are designed to correct employee attendance by using the least severe penalty possible to remedy the problem, relying on more severe penalties in the event the matter is not resolved voluntarily by the employee. All corrective measures will be recorded in the employee's personnel file.

Our no fault attendance policy will treat all employees equally and will ensure that each employee is aware, at each step of the procedure, of the measures that must be taken to avoid further discipline. A "no fault" policy looks at attendance patterns, not reasons for absences. Therefore, all absences are counted, no matter what the reason, unless they are an exception under No. 6 of this Absentee Control Program.

Any disciplinary action imposed as a result of excessive absenteeism and/or tardiness is based on frequency of "occurrences" rather than actual number of days involved. The following rules shall apply:

1.  <u>Tardiness</u>  A tardy is defined as one being late for work for a period of more than six (6) minutes from scheduled start time, but less than fifty percent (50%) of scheduled workday without prior approval of a supervisor. The following corrective measures will be applied:

(a) Upon three (3) tardy occurrences within a twelve (12) month period, a first notice will be issued by the immediate supervisor.

(b) Upon five (5) tardy occurrences within a twelve (12) month period, a second notice will be issued by the immediate supervisor.

(c) Upon seven (7) tardy occurrences within a twelve (12) month period, the employee will receive a final notice.

(d) Upon eight (8) tardy occurrences within a twelve (12) month period, the employee will be suspended from employment for up to three (3) scheduled workdays.

(e) Upon nine (9) tardy occurrences in twelve (12) months, the employee will be discharged from employment.

2.   Early Leave   An Early Leave occurrence is defined as leaving work more than six (6) minutes before the scheduled stop time, but less than fifty percent (50%) of the scheduled workday, without prior approval of a supervisor. The following corrective measures will be applied:

(a) Upon three (3) early leave occurrences within a twelve (12) month period, a first notice will be issued by the immediate supervisor.

(b) Upon five (5) early leave occurrences within a twelve (12) month period, a second notice will be issued by the immediate supervisor.

(c) Upon seven (7) early leave occurrences within a twelve (12) month period, the employee will receive a final notice.

(d) Upon eight (8) early leave occurrences within a twelve (12) month period, the employee will be suspended from employment for up to three (3) scheduled workday.

(e) Upon nine (9) early leave occurrences with a twelve (12) month period, the employee will be discharged from employment.

3.   Absence   An absence is defined as missing more than fifty percent (50%) of the scheduled shift. The following corrective measures will apply:

(a) Upon four (4) absences within a twelve (12) month period, the employee will receive a first notice.

(b) Upon six (6) absences within a twelve (12) month period, the employee will receive a second notice.

(c) Upon seven (7) absences within a twelve (12) month period, the employee will receive a final notice.

(d) Upon eight (8) absences within a twelve (12) month period, the employee will be suspended without pay for up to five (5) scheduled workdays, and specifically warned that upon return from suspension, one (1) additional absence will result in termination from employment.

(e) Upon nine (9) absences in twelve (12) months, the employee will be discharged from employment.

4.   No Call/No Show   The failure of an employee to report to work for the full shift without calling or without prior approval from the immediate supervisor, will be recorded as no call/no show.   An employee in a no call/no show status will be discharged.

5.   Recording Procedure   If you are going to be tardy, you must notify your supervisor at least one (1) hour before your shift begins except in cases of verifiable emergencies.

An employee will be recorded upon initial late reporting as being tardy. If fifty-one percent (51%) of the scheduled workday passes and the employee still has not reported, then his/her status will be converted to "absent". If at the end of the shift the employee has still not reported and the absence has not been approved by the immediate supervisor, then the employee will be converted to a "no call/no show" status. An employee will not be recorded in more than one (1) absentee category per incident.

6.   Absence for Medical Condition   Any absence for medical condition of the employee will only be recorded as one (1) absence occurrence regardless of the number of consecutive days missed for the same medical reason.

7.   Policy Exceptions   Employees absent due to employer approved leave of absence, a work-related injury, approved time off, jury duty or funeral leave will not be recorded as being absent for purposes of this policy. Employees prevented from reporting to work due to

emergency weather conditions which affect the entire facility will not be considered to be absent or tardy if they telephone the facility and report their inability to come to work on time.

8. Record Correction Procedure   For each six (6) consecutive months in which an employee has had no recorded tardiness (as those terms are defined herein) occurrences, the two (2) longest standing tardiness occurrences will not be considered for the purpose of future corrective procedures.

For each six (6) consecutive months in which an employee has had not recorded absence (as those terms are defined herein) occurrences, the longest standing absence occurrence will not be considered for the purpose of future corrective procedures.

Each tardiness and absence occurrence will cease to be considered twelve (12) months after its occurrence.

Effective April 5, 1996, all current employees will be reduced one (1) step in the current disciplinary process.

9. Weekend Calloffs   Each calendar year, during the first six (6) months and again during the second six (6) months, an employee will be permitted one (1) weekend calloff without having to make up their absence. Two (2) or more weekend calloffs within either (6) month period must be made up unless a verifiable physician's certificate is produced within forty-eight (48) hours of said calloff.

SEIU Healthcare Pennsylvania CTW, CLC

Northern Health Facilities, Inc. d/b/a Spruce Manor Nursing and Rehabilitation Center

_____
For the Union

_____
For the Employer

_____
Date

_____
Date

65

## STATEMENT OF UNDERSTANDING

The parties agree that any workplace situation that may result in an injury needs to be reviewed. Therefore, the Employer will establish a program by which, with the input of the Union, there will be a review and investigation of possible job stressors, which will be addressed by the following:

The Employer will hire a mutually acceptable reputable ergonomics consultant to study workplace stressors.

A work site analysis will be conducted annually by the ergonomics consultant. The analysis will include an evaluation of OSHA 200 logs, incident reports, Workers' Compensation cases, accident frequency and severity rates, and any other information the ergonomics consultant deems relevant.

The Safety Committee shall form a subcommittee, composed equally of management and Union members, to meet with the ergonomics consultant to contribute to the work site analysis. An appropriate amount of training in ergonomics, as determined by the consultant, shall be provided for the subcommittee members. The subcommittee shall meet as it determines necessary to complete its work.

The ergonomics subcommittee shall, in conjunction with the consultant, assist in semiannual inspections to identify possible stressors.

The ergonomics consultant shall review and evaluate appropriate equipment to determine its potential for reducing work related stressors. The ergonomics subcommittee shall assist in the evaluation of such equipment

The ergonomics consultant will submit a report, annually, of his/her findings and recommendations. The Employer and Union shall cooperate to implement the ergonomics consultant's recommendations.

The terms set forth in this Statement of Understanding are not considered to be part of the parties' collective bargaining agreement and are not subject to enforcement under the terms of the grievance and arbitration procedures set forth in the agreement.

SEIU Healthcare Pennsylvania CTW, CLC

Northern Health Facilities, Inc. d/b/a Spruce Manor Nursing and Rehabilitation Center

_____
For the Union

_____
For the Employer

_____
Date

_____
Date

SCHEDULE 1

Effective upon ratification and during the term of this Agreement, the Wage Scales/Start Rates shall be increased by the following amounts and all employees shall receive the across the board increase or the new rate whichever is greater.

4/1/13      4/1/14      4/1/15

$0.30      $0.35      $0.35

The new minimum job rates shall be as follows:

| Job | 4/1/13 |
|---|---|
| LPN | |
| 0-3 years | 20.84 |
| 3-5 years | 21.40 |
| 5-10 years | 21.95 |
| Over 10 years | 22.52 |
| Cooks | 14.21 |
| CNA | 13.59 |
| All Others | 12.87 |

The Employer, at its discretion, may raise the start rate upon notice to the union and will meet with the union if requested.  The employer agrees that a current employee will not make less than any new hire employee in the same job classification.

The Employer may, at its sole discretion, implement, modify or eliminate incentives to hire new employees, encourage safe working practices, or for any other business reason.

Employees who completed at least twenty (20) years of service and are at least fifty (50) years of age in 2007 shall receive a one time bonus of two hundred dollars ($200.00).

Maintenance assistants who are on call shall receive ten dollars ($10.00) for each day they are on-call.

Current LPN employees will be credited for their prior experience and move along the wge scale on their relevant anniversary dates.  Newly hired LPN's will be credited with their years of experience and placed on the wage scale.

The no frills rate option shall continue and be computed as follows: Base hourly rate times the number of points from the selected benefits program, divided by 2,080 hours, and added to the base hourly rate. (e.g.:  $9.75 rate plus three (3) years' service at $0.05 per year equals $9.75 plus $0.15 equals $9.90 times 350 points equal 3,465 divided by 2,080 equals $1.67 plus $9.90 equals $11.57 as the no frills rate)

Shift Differential:  For LPNs only, shift differential of $.75 per hour on 3-11 and 11-7 shifts for a ninety (90) day trial period.  Employees who change shifts for the differential may return to their previous shift if the differential is cancelled upon request and shall continue to receive the differential until they are returned to their previous shift.

12 Hour Shifts:  LPNs can work 12 hour shifts and sign for a 40 hour workweek.  They must sign a form for the 40 hour week lasting for a minimum of one year.

<u>In-House Pool</u>:   Both parties are committed to using Full-time and Part-time employees whenever possible.   We agree to the following In-House Pool policy:

1.   These changes shall be implemented on a 90 day trial basis at which time the parties will meet to discuss its status.

2.   Pool LPNs will be paid $18.00 per hour on weekdays and $20.00 per hour on weekends.  The weekend is defined as 3-11 Friday through 11-7 Sunday

3.   Pool LPNs must work two weekend shifts in every four week schedule.

4.   Pool LPNs must work Christmas Eve or Christmas Day and New Years Eve or New Years Day

5.   Pool LPNs will be paid overtime on a 40 hour week

6.   Pool LPNs will receive no other contractual benefits

7.   Pool employees who work 20 hours or more per pay period are in the bargaining unit and there shall be a limit of six (6) such employees.

8.   Employees may elect to become Per Diem employees one time only.

9.   Pool employees can elect a weekend option to work 4 weekends on and have one off and shall be paid $22.00 per hour.

## HSG LETTER OF AGREEMENT

It is hereby agreed by and between HEALTHCARE SERVICES GROUP, INC. (hereinafter the "Employer") and SEIU HEALTHCARE PENNSYLVANIA, CTW, CLC, (hereinafter the "Union"), as follows:

The Employer and Union agree to be bound by all terms and conditions of the Collective Bargaining Agreement currently in effect between the Union and **Spruce Manor Nursing & Rehabilitation Center** for housekeeping and laundry employees employed by the Employer at this location.

This Agreement shall be in full force and effect until the end of the current contract.  The Employer and the Union agree to jointly enter into discussions relative to a renewal of this Agreement no later than the ninetieth (90th) day immediately preceding the termination of this Agreement.

SEIU Healthcare Pennsylvania
CTW, CLC

Healthcare Services Group
at
Northern Health Facilities, Inc.
d/b/a Spruce Manor Nursing and
Rehabilitation Center

_____

For the Union

_____

For the Employer

_____

Date

_____

Date

71

# MEMORANDUM OF UNDERSTANDING

The Parties agree to grant vacation/ personal day time off requests for one Union member (regardless of job classifications), per shift, over the holiday season, between Christmas Day and New Years Day. Requests would be approved by classification seniority if submitted by March 31st and/or first come first serve after March 31st. Time off requests will not be granted on the actual holiday.

SEIU Healthcare Pennsylvania
CTW, CLC

Northern Health Facilities, Inc.
d/b/a Spruce Manor Nursing and
Rehabilitation Center

_____
For the Union

_____
For the Employer

_____
Date

_____
Date

72

# EXHIBIT "E"

POST & SCHELL, P.C.
Sarah C. Yerger, Esquire
PA I.D. No. 70357
Vincent Candiello, Esquire
PA I.D. No. 49616
17 North Second Street, 12th Floor
Harrisburg, PA  17101
Telephone:  (717) 731-1970
Facsimile:  (717) 731-1985
Email:  vcandiello@postschell.com
Email:  syerger@postschell.com

ATTORNEYS FOR DEFENDANTS

| | | |
|---|---|---|
| **APRIL ROBERTS,** | : | **IN THE COURT OF** |
| | : | **COMMON PLEAS OF BERKS** |
| **Plaintiff,** | : | **COUNTY, PENNSYLVANIA** |
| | : | |
| **v.** | : | |
| | : | |
| **SPRUCE MANOR NURSING &** | : | No. 2014-CV-14863 |
| **REHABILITATION CENTER;** | : | |
| **NORTHERN HEALTH FACILITIES,** | : | Civil Division |
| **INC.; EXTENDICARE HEALTH** | : | |
| **SERVICES, INC.; JASON AUGE;** | : | |
| **BETSY ROBLES,** | : | |
| | : | |
| **Defendants.** | : | |

---

## NOTICE OF REMOVAL

---

To:   Marianne R. Sutton, Prothonotary
      Office of the Prothonotary
      Berks County Courthouse, 2nd Floor
      633 Court Street
      Reading, PA  19601

1

12099873v1

and

Stephen Werner, Esquire
Werner Law Group
P.O. Box 4886
Harrisburg, PA  17111

**PLEASE TAKE NOTICE** that, in accordance with 28 U.S.C. § 1446, a

Removal Petition and a Notice of Removal were filed in the United States District

Court for the Eastern District of Pennsylvania on this date, removing the above-

captioned action to federal court.  A true and correct copy of the Removal Petition

is attached hereto.

Respectfully submitted,

**POST & SCHELL, P.C.**

Sarah C. Yerger, Esquire
PA I.D. No. 70357
Vincent Candiello, Esquire
PA I.D. No. 49616
17 North Second Street , 12th Floor
Harrisburg, PA  17101
Telephone:  (717) 731-1970
Facsimile:  (717) 731-1985
Email:syerger@postschell.com
Dated:  July 17, 2014                    Email:  vcandiello@postschell.com

2

12099873v1

## CERTIFICATE OF SERVICE

I, Sarah C. Yerger, Esquire, an attorney at the law firm of Post &
Schell, P.C., do hereby certify that on the date set forth below, I did cause to be
served a true and correct copy of the foregoing document upon the following
individual(s) via U.S. Mail, First Class, postage prepaid, as follows:

Stephen S. Werner, Esquire
Werner Law Group
P.O. Box 4886
Harrisburg, PA  17111

Dated:  July 17, 2014

_____
Sarah C. Yerger

3